David Mark **FRENTZ**, Appellant–Defendant,

v.

**STATE** of Indiana, Appellee–Plaintiff.

No. 59A05–0610–CR–559.

Court of Appeals of Indiana.

Oct. 31, 2007.

---

Matthew Jon McGovern, Evansville, IN, Attorney for Appellant.

Steve Carter, Attorney General of Indiana, Jodi Kathryn Stein, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

CRONE, Judge.

### Case Summary

David Mark Frentz appeals his convictions and fifty-nine-year aggregate sentence for murder, class C felony methamphetamine possession, class C felony cocaine possession, and class D felony marijuana possession. We affirm.

### Issues

We reorder and restate the issues as follows:

I. Whether the trial court committed reversible error in joining and then denying Frentz's motions to sever the drug possession counts from the murder count;

II. Whether the trial court abused its discretion in denying Frentz's motions for mistrial;

III. Whether the trial court abused its discretion in imposing consecutive sentences; and

IV. Whether Frentz's sentence is inappropriate in light of the nature of the offenses and his character.

### Facts and Procedural History

The facts most favorable to the jury's verdict indicate that twenty-three-year-old Zackary Reynolds lived with the fifty-three-year-old Frentz and worked on his Orange County farm. On Saturday, January 22, 2005, Frentz's doctor told him that he would die if he did not stop drinking. Frentz had been drinking for thirty years and quit "cold turkey" that day. Tr. at 1244.[1] Frentz's doctor gave him pills to alleviate "the DT's[.]" *Id.* at 1264. On Sunday, January 23, Frentz ran some errands, came home to work on a pickup truck with Reynolds, and then ran additional errands. On his way home, Frentz stopped at a fast-food drive-through in Salem between 10:00 and 11:00 p.m. While there, he talked on his cell phone with his friend Carl Brock. Frentz told Brock that he had been "feeling bad" and had been hallucinating, with "either light poles or salt shakers dancing or something like that, uh, dogs running across the road

laughing at him and stuff like that." *Id.* at 1730. Brock became concerned and asked Frentz to call him when he got home.

Brock went online for an hour or two, thereby tying up his telephone line. Brock then called Frentz's cell phone. Frentz asked both Brock and his wife if they had heard from his ex-girlfriend, Dusty Austin, with whom he had broken up several weeks earlier. Frentz stated that he had been "fucked over" by his long-time friend Chuck Woolsey, who he thought was having a sexual relationship with Austin. *Id.* at 1733. During the course of the conversation, Frentz went from "feeling ill and hallucinating to someone who was very sober and [not] really talkative at all." *Id.* at 1734. In an attempt to smooth things over, Brock made some humorous remarks.[2] Frentz hung up. Brock believed that Frentz had "snapped" and tried calling him several times, to no avail. *Id.* at 1735.

At approximately 3:00 a.m. on Monday, January 24, Frentz's neighbor Debra Sayles drove by his house on her way home from work and noticed that all the lights were on, which was not unusual. At approximately 3:30 a.m., Brock finally reached Frentz by telephone. Frentz was "freaked out" and told Brock to call the police. *Id.* at 1736. Frentz told Brock that "he put PCP in that shit [3] and people

---

1. Indiana Appellate Rule 28(A)(6) provides that the transcript "shall be bound using any method which is easy to read and permits easy disassembly for copying." We note that by the time the eleven-volume transcript in this case reached this Court, the plastic front and back covers of most of the volumes had broken loose from their metal bindings.

2. At trial, Brock stated,
   I can't really remember in exact detail what [those remarks] were. Something to do with, uh, there is no way that [Austin] had, I've never been Chuck Woolsey so I didn't know, you know, but I just, I just told him

   something in the order that she would choose Woolsey over you, you know, you got that sweet butt going on or something like that. And about that time, uh, I said something about I'm not trying to be a smart ass Mark, uh, I guess actually I'm just a dumb ass and about that time the phone went dead.
   Tr. at 1735.

3. With respect to this remark, Brock said, "I'm going to assume [Frentz] was talking about Woolsey, I'm not sure." Tr. at 1736.

[are] up here to fuck with us." *Id.* Frentz "said something about [who's] out there, get back in here, who broke that light." *Id.* Frentz "kept hollering" at Reynolds, but Brock never heard Reynolds reply. *Id.* Brock offered to pick up Frentz, and Frentz agreed. When Brock asked to talk to Reynolds, Frentz hung up. As Brock got dressed, his wife called Frentz and asked to talk to Reynolds. Frentz hung up again. Brock then called a phone number that Austin had given him after breaking up with Frentz. Woolsey answered the phone. Brock told Woolsey to tell Austin that Frentz had "snapped." *Id.* at 1765. Brock's wife refused to let Brock go to Frentz's home.

Early that morning, two of Frentz's neighbors saw and heard what appeared to be Frentz's pickup truck driving down the road at a high rate of speed. At approximately 5:30 a.m., Frentz called 911 on his cell phone and stated that several people were trying to break into his house. The phone line went dead several times during the course of the call. Frentz reported that the intruders had broken into the house, that one of the intruders was shooting, that his friend had been shot in the chest, that his friend was still breathing, that the intruders were still in the home, that the intruders were "trying to get in the windows" and doors, and that he had "locked the door back." *Id.* at 812. The call ended when the operator confirmed with Frentz that assistance had arrived.

Officers from Washington and Orange Counties responded to Frentz's 911 call. None of them observed any vehicle or foot traffic or anything unusual on their way to Frentz's home. They saw Frentz standing in the kitchen. Appearing disoriented and agitated, Frentz opened the door and motioned for them to come in. One of the officers saw an SKS assault rifle lying on a kitchen chair and "secured it" for their

safety. *Id.* at 842. The SKS was a semiautomatic firearm, which fires a bullet each time the trigger is pulled. Another officer handcuffed Frentz, who was dressed in underwear and a t-shirt and was "sweating really bad." *Id.* at 844. Frentz told the officers that Mexicans on motorcycles had broken into his house and that there was someone in his bed. The officers found no one in Frentz's bed and no signs of a struggle or forced entry.

From the kitchen, a third officer saw Reynolds lying face-up in a hallway in a pool of blood, on top of a loaded .22–caliber rifle. Reynolds's body was cool to the touch and showed no signs of life. He had been struck by three bullets: one that passed through his right wrist and deeply grazed his right abdomen; a second that entered the middle of his chest, lacerated his liver and adrenal gland, and lodged near his spine; and a third that entered the upper right side of his chest, fractured the ribs and collarbone, extensively damaged his right lung, and exited above the scapula. The two chest wounds exhibited stippling from gunshot residue, which indicated that the firearm's muzzle had been within two feet of Reynolds when the bullets were fired. All the wounds were lethal, and Reynolds bled to death within minutes. A toxicology exam revealed traces of methamphetamine and amphetamine in Reynolds's blood. A ballistics test established that the bullet that lodged near Reynolds's spine was fired from the SKS. Genetics testing revealed traces of Reynolds's DNA on Frentz's t-shirt. In the hallway, police recovered four shell casings of the same caliber as the SKS. Three bullets had penetrated the closet door in front of which Reynolds had been standing when he was shot. Police noticed that Reynolds's bedroom window had been shot through several times from the inside and found similar shell casings nearby.

Orange County Sheriff's Detective Michael Dixon arrived and asked another officer to Mirandize Frentz and remove his handcuffs. Detective Dixon then questioned Frentz about the incident. Frentz stated that he had been asleep in his bedroom and heard a scuffle at the other end of the house. He grabbed the .22, walked down the hallway, and saw two Hispanic men exiting the back door. Frentz saw Reynolds fighting with a third Hispanic man over the SKS. Frentz set the .22 down, grabbed the intruder, and heard two gunshots. The intruder left the home and drove away with his companions in a sport utility vehicle. Frentz stated that the three men had broken into his home through a window.

Thereafter, Indiana State Trooper Bill Flick transported Frentz to Detective Dixon's office for an interview. Frentz read and signed an advisement of rights form. Frentz told Trooper Flick that when he went to bed at 11:00 on Saturday evening, Reynolds was playing cards and drinking beer with two unknown young white men at the kitchen table. Between 4:30 and 5:30 a.m., Frentz heard Reynolds yell and saw three Hispanic men, two of whom went out the back door. Frentz grabbed the .22, called 911, and went into the hallway, where Reynolds was scuffling with the third intruder over the SKS. Frentz placed the .22 on the floor, grabbed the intruder, and heard a gun go off. The intruder went out the back door. Frentz heard a motorcycle and saw a black sport utility vehicle drive off. Frentz heard someone outside the house and fired shots through the window and out the back door.

At Frentz's home, police found marijuana in plain view and obtained a search warrant. Police found a total of 39.49 grams of marijuana in a mug near the kitchen, underneath Frentz's mattress, in a sewing basket, and in a jar wrapped with black electrician's tape. Police also found cocaine residue in a one-hitter above the refrigerator, as well as methamphetamine residue on a mirror next to a rolled-up dollar bill in a kitchen cabinet. A toxicology exam revealed traces of ephedrine and cocaine metabolites in Frentz's blood. At trial, the court excluded Frentz's toxicology report pursuant to a motion in limine.

After further investigating the scene and questioning Frentz's mother, Trooper Flick and Detective Dixon interviewed Frentz a second time that same day. Frentz told the officers that he had stopped drinking "cold turkey" on Saturday after thirty years and had been given medication. *Id.* at 1244. He denied telling his mother that he was hallucinating and claimed that he had told her he felt "fuzzy" from the medication. *Id.* at 1227. Frentz stated that Reynolds had been "just outside of his door" when he was shot and that he remembered hearing three gunshots. *Id.* at 1228. He stated that he put his hands "over [Reynolds's] bleeding" at the urging of the 911 operator and that he loved Reynolds "like my boy." *Id.* at 1231, 1245. Frentz spent the night in the Orange County jail.

The following morning, Frentz asked to speak with Trooper Flick. Frentz told Trooper Flick that he had taken his medication the night before and experienced hallucinations. He stated that "it was like [the medication] was givin' [him] the DT's" instead of taking them away. *Id.* at 1264. He further stated that Reynolds had purchased drugs that weekend from someone who was interested in Austin, his ex-girlfriend. Frentz wondered if that person might have altered the drugs and persuaded Reynolds to "slip [him] some[.]" *Id.* at 1260. Frentz denied that his medication and any altered drugs he might have ingested might have caused him "to just

randomly start shootin' that rifle[.]" *Id.* at 1261.

While in jail, Frentz discussed Reynolds's shooting with fellow prisoners and serial felons Troy Brackett and David Turner. Frentz told Brackett that A.J. Guthrie and Eric Lloyd had sold methamphetamine to Reynolds and then attempted to steal it back. During the ensuing struggle, Reynolds was accidentally shot. Later, Frentz told Brackett that he and Reynolds had argued about the drug purchase from Guthrie and Lloyd, who had bought the drugs from Woolsey, who was living with Austin. Frentz said that he heard a noise that night that "played to his role" and shot Reynolds with an SKS. *Id.* at 1780. Frentz told Brackett that Reynolds "shouldn't have been messing with [his] old lady." *Id.* at 1781.

Frentz told Turner that he had come home on Sunday evening to find Reynolds with Guthrie and Lloyd. Reynolds offered Frentz methamphetamine, which he declined. Frentz went to bed, then got back up and told Reynolds that it was not a good idea to have "all that meth" in front of Guthrie and Lloyd. *Id.* at 1878. Guthrie and Lloyd later broke in to steal the methamphetamine, resulting in a struggle that claimed Reynolds's life. Frentz asked Turner what he thought of the story. Turner replied that if he were on a jury, he would convict Frentz. Later, Frentz told Turner that Woolsey and Austin had hired Mexicans to break into his home and kill him for his life insurance policy and that they had shot the wrong person. Frentz then told Turner that he had sent Reynolds to persuade Austin to return to Frentz's home. Reynolds was gone for a long time, and Frentz began to suspect that he and Austin were romantically involved. That night, Frentz looked out his window and saw Austin standing behind a telephone pole. He thought that she and Reynolds were going to run off together, which "ticked him off[.]" *Id.* at 1880. He grabbed a gun, confronted Reynolds, and shot him. Frentz realized that "he'd messed up pretty bad" and shot Reynolds twice more to kill him. *Id.* Frentz said that he placed the .22 underneath Reynolds's body and drove his truck up and down the road several times to make the neighbors think "that they heard several vehicles leaving his place at a high rate of speed[.]" *Id.* at 1881. Frentz kept changing his story until he finally got Turner's approval.

Frentz offered to pay Brackett and Turner to drop .45–caliber shells outside his house and put pry marks outside the windows. He also told both men that his brother had entered his home and retrieved $700 in cash from his jacket pocket and an ounce of methamphetamine from his jeans pocket, which his brother flushed down the toilet. Frentz's brother and sister-in-law did in fact find over $600 in cash in Frentz's jeans pocket while cleaning his house after the shooting.

While in jail, Frentz received a letter from Reynolds's father with Reynolds's obituary and a sarcastic request to help pay the funeral expenses. Frentz threw the obituary on the floor and told Brackett that "if he was going to pay for [Reynolds's] funeral he would have never killed him." *Id.* at 1783. Frentz told Turner that Reynolds's relatives were "[m]oney-hungry son-of-a-bitches." *Id.* at 1887.

On January 27, 2005, the State charged Frentz with murder, class C felony methamphetamine possession, class C felony cocaine possession, and class D felony marijuana possession. On March 16, 2005, the State amended the information to include class C felony anhydrous ammonia possession and class D felony receiving stolen property. On May 27, 2005, Frentz filed a motion to sever the illicit substance counts

from the murder count, which the trial court denied. On January 3, 2006, Frentz renewed his motion to sever, which the trial court granted in part by severing the anhydrous ammonia possession and receiving stolen property counts from the remaining counts.

Frentz's jury trial lasted from March 27, 2006, to April 10, 2006, during which Frentz unsuccessfully renewed his motion to sever. In his opening statement, Frentz's counsel said, "[W]e agree with ninety-nine percent of what the State says, probably 99.9 percent of what the State says." *Id.* at 783. Frentz's counsel acknowledged that there were no signs of a struggle on the night of the shooting and that the evidence did not support Frentz's version of events. Detective Dixon agreed with Frentz's counsel's statement that the physical evidence indicated that Reynolds "was shot outside of his door standing up, fairly quickly, and that [Frentz] seemed to be the only one in the residence[.]" *Id.* at 1140.

After the close of evidence, the State requested an instruction on the lesser-included offense of voluntary manslaughter.[4] Frentz's counsel objected, arguing that there was no evidence of sudden heat to warrant such an instruction. Counsel then elicited sworn testimony from Frentz that he did not want either side to request instructions on a lesser-included offense. *Id.* at 2089–90. The trial court found no serious evidentiary dispute as to the existence of sudden heat and denied the State's request for a voluntary manslaughter instruction. The jury found Frentz guilty as charged.

On September 5, 2006, the trial court sentenced Frentz to fifty-five years for murder. The court also sentenced Frentz to four years for methamphetamine possession, four years for cocaine possession, and two years for marijuana possession, to be served concurrent to each other and consecutive to the murder sentence, for an aggregate term of fifty-nine years. Frentz now appeals his convictions and sentence.

## Discussion and Decision

### I. Improper Joinder/Denial of Motions to Sever

Indiana Code Section 35–34–1–9 reads in pertinent part as follows:

(a) Two (2) or more offenses may be joined in the same indictment or information, with each offense stated in a separate count, when the offenses:

(1) are of the same or similar character, even if not part of a single scheme or plan; or

(2) are based on the same conduct or on a series of acts connected together or constituting parts of a single scheme or plan.

Indiana Code Section 35–34–1–11 reads in pertinent part as follows:

(a) Whenever two (2) or more offenses have been joined for trial in the same indictment or information solely on the ground that they are of the same or similar character, the defendant shall have a right to a severance of the offenses. In all other cases the court, upon motion of the defendant or the prosecutor, shall grant a severance of offenses whenever the court determines that severance is appropriate to promote a fair determination of the defendant's guilt or innocence of each offense considering:

4. *Compare* Ind.Code § 35–42–1–1 (defining murder as the knowing or intentional killing of another human being) *with* Ind.Code § 35–42–1–3 (defining voluntary manslaughter as the knowing or intentional killing of another human being while acting under sudden heat).

(1) the number of offenses charged;

(2) the complexity of the evidence to be offered; and

(3) whether the trier of fact will be able to distinguish the evidence and apply the law intelligently as to each offense.

■ Throughout these proceedings, Frentz has argued that the drug possession counts and the murder count were improperly joined in the first instance and that the trial court committed reversible error in denying his motions to sever. Both parties acknowledge that the drug possession counts and the murder count are not "of the same or similar character" and that they were joined on the premise that they were "based on the same conduct or on a series of acts connected together or constituting parts of a single scheme or plan" pursuant to Indiana Code Section 35–34–1–9(a)(2). Frentz contends that this premise is incorrect. *See Ben–Yisrayl v. State*, 690 N.E.2d 1141, 1145 (Ind.1997) ("Under [Ind.Code § 35–34–1–9(a)(2) ], offenses may be sufficiently 'connected together' to justify joinder if the State can establish that a common *modus operandi* linked the crimes and that the same motive induced that criminal behavior."), *cert. denied* (1999). He further contends that no Indiana case has outlined "the standard of review when the joinder of criminal

charges has no justification under our joinder statute" and refers us to federal law regarding misjoinder. Appellant's Br. at 15.

Federal Rule of Criminal Procedure 8(a) governs joinder of offenses and reads as follows:

The indictment or information may charge a defendant in separate counts with 2 or more offenses if the offenses charged—whether felonies or misdemeanors or both—are of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan.

Misjoinder of offenses under Federal Criminal Rule 8(a) is characterized as "technical misjoinder" in federal jurisprudence. *See United States v. Dileo*, 859 F.Supp. 940, 944 (W.D.Pa.1994).[5] Federal Criminal Rule 14(a) provides that "[i]f the joinder of offenses or defendants in an indictment, or information, or a consolidation for trial appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires." Misjoinder of offenses under Federal Criminal Rule 14(a) is characterized as "prejudicial misjoinder." *See Dileo*, 859 F.Supp. at 944.[6]

---

**5.** In *Dileo*, the defendant was "charged with five counts of mail fraud and thirteen counts of distribution of a controlled substance." 859 F.Supp. at 941. The defendant filed a motion to sever on the basis that the indictment misjoined the drug and mail fraud counts in violation of Federal Criminal Rule 8(a), in that they were not of the same or similar character, were not based on the same act or transaction, and did not constitute parts of a common scheme or plan.

**6.** The *Dileo* court noted that the "defendant's motion for severance and supporting brief contain no mention of prejudice, presumably because the motion rests on a theory of tech-

nical misjoinder under Rule 8(a), rather than prejudicial misjoinder under Rule 14." 859 F.Supp. at 944. The court noted, however, that the defendant had invoked Rule 14 "as a 'fallback position' at a pretrial conference in this matter." *Id.* The court went on to say,

Among the kinds of prejudice that may obtain from joinder of offenses are "1) the jury may cumulate evidence of the separate crimes; 2) the jury may improperly infer a criminal disposition and treat the inference as evidence of guilt; 3) the defendant may become 'embarrassed or confounded' in presenting different defenses to the different charges."

The Third Circuit Court of Appeals has stated that " 'Rule 14 dealing with relief from prejudicial joinder only comes into play after it has first been determined that joinder was permissible under Rule 8[.]' " *Id.* at n. 3 (quoting *United States v. Graci,* 504 F.2d 411, 413 (3d Cir.1974)). Cast in these terms, the primary basis for Frentz's motions to sever was technical misjoinder, i.e., that the drug counts and the murder count were not "based on the same conduct or on a series of acts connected together or constituting parts of a single scheme or plan" as contemplated by Indiana Code Section 35–34–1–9(a)(2). We agree with Frentz that no Indiana cases have outlined a standard of review for a claim raised pursuant to that statute.

■ Having said this much, however, we observe that Indiana law has not specifically recognized a distinction between technical misjoinder and prejudicial misjoinder.[7] We further observe that even if we were to follow federal precedent, as Frentz urges, and hold that severance of technically misjoined charges is mandatory,[8] we would ultimately conclude that any error in the trial court's denial of his motions to sever was harmless.[9] *See Dill v. State,* 727 N.E.2d 22, 24 (Ind.Ct.App.2000) (invoking harmless-error rule in declining to decide whether severance was discretionary or mandatory: "In reviewing errors in the application of state evidentiary or procedural law, appellate courts apply harmless error rules. An error is harm-

---

*Id.* (quoting *Blunt v. United States,* 404 F.2d 1283, 1288 (D.C.Cir.1968), *cert. denied* (1969)). These considerations are similar to those mentioned in Indiana Code Section 35–34–1–11(a) and cases addressing that statute.

**7.** *Cf. Harvey v. State,* 719 N.E.2d 406, 409 (Ind.Ct.App.1999) ("If offenses are joined solely on the ground that they are of the same or similar character, a defendant is entitled to severance as a matter of right and the trial court has no discretion to deny a motion to sever. Ind.Code § 35–34–1–11(a). If, however, offenses are joined as being part of a single scheme or plan, it is within the trial court's discretion to grant severance when it is 'appropriate to promote a fair determination of the defendant's guilt or innocence of each offense.' Ind.Code § 35–34–1–11(a).") (citation omitted). In light of the plain wording of the applicable statutes, it appears that a violation of Indiana Code Section 35–34–1–9(a) would result in technical misjoinder and that a violation of Indiana Code Section 35–34–1–11(a) would result in prejudicial misjoinder. Thus, in federal parlance, a claim of prejudicial joinder pursuant to Indiana Code Section 35–34–1–11(a) would "come into play" only after it has first been determined whether joinder was permissible under Indiana Code Section 35–34–1–9(a). To the extent that Indiana cases have addressed what are essentially technical misjoinder claims under Indiana Code Section 35–34–1–9(a) in the context of Indiana Code Section

35–34–1–11(a), we note that the latter statute addresses different considerations than and appears to presume that the offenses were properly joined pursuant to Indiana Code Section 35–34–1–9(a)(2).

**8.** *Compare United States v. Burton,* 724 F.2d 1283, 1286 (7th Cir.1984) (noting that "improper joinder requires mandatory severance"), *with Davidson v. State,* 558 N.E.2d 1077, 1083 (Ind.1990) ("Unless the defendant is entitled to severance as a matter of right under Ind.Code 35–34–1–11(a), whether to sever multiple charges is a matter within the trial court's discretion, taking into account the three factors listed in the statute, and a denial of severance will be reversed only upon a showing of clear error.").

**9.** Frentz observes that the State did not respond to his argument that any error in the denial of his motions to sever the drug charges was not harmless. It is true, as Frentz states, that "[a]n appellee's failure to respond to an issue raised by an appellant is akin to failure to file a brief" and that Frentz may win reversal if he establishes prima facie error, i.e., "error that is evidence at first sight, on first appearance, or on the face of it." *Atchley v. State,* 730 N.E.2d 758, 766 (Ind.Ct.App.2000) (citation and quotation marks omitted), *trans. denied.* We conclude that Frentz has failed to carry that burden here.

less if its probable impact on the jury, in light of all the evidence in the case, is sufficiently minor as not to affect the substantial rights of the party.") (citation omitted), *aff'd in relevant part by* 741 N.E.2d 1230 (Ind.2001); *see also United States v. Lane,* 474 U.S. 438, 449, 106 S.Ct. 725, 88 L.Ed.2d 814 (1986) (holding that misjoinder under Fed.Crim. Rule 8 is subject to harmless-error rule: "[A]n error involving misjoinder 'affects substantial rights' and requires reversal only if the misjoinder results in actual prejudice because it 'had substantial and injurious effect or influence in determining the jury's verdict.'") (quoting *Kotteakos v. United States,* 328 U.S. 750, 775, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946)).[10]

The evidence that Frentz possessed methamphetamine, cocaine, and marijuana was overwhelming. So, too, was the evidence that Frentz was the person who shot and killed Reynolds. The only issue in dispute was whether Frentz knowingly or intentionally killed Reynolds. *See* Ind. Code § 35–42–1–1 (defining murder as the knowing or intentional killing of another human being); Tr. at 785 (conclusion of defense counsel's opening statement: "Your job in this case once you hear all of this physical evidence [the State] wants you to look at and I'm begging you to look at, the question will be what does that physical evidence show me? Does it show me a knowing and intentional killing? Or does it show you something else?").

Frentz argues that the drug-related evidence "decimated the heart" of his de-

fense, which he asserts was based entirely on the premise that "the killing was the accidental result of [his] hallucinations and medication." Appellant's Br. at 30.[11] The evidence supporting this defense was contradictory, at best, in that Frentz himself denied having hallucinations when he was questioned by police on the day of the shooting. Moreover, Frentz had the presence of mind to plant the .22 under Reynolds's corpse and to concoct stories blaming Hispanic intruders for the killing. Not until the day after the shooting, when he was incarcerated, did Frentz tell police that he had hallucinations; even then, he denied that his medication might have caused him to "randomly start shootin' that rifle[.]" Tr. at 1261.

To the extent Frentz claims that the drug-related evidence improperly bolstered Brackett's and Turner's testimony suggesting that Frentz killed Reynolds over drugs, we note that plenty of evidence—including Brackett's and Turner's testimony—suggests that Frentz killed Reynolds because he suspected that Reynolds was romantically involved with his ex-girlfriend Austin. In any event, the State was not required to prove Frentz's motive for killing Reynolds, only his intent. *See Moore v. State,* 653 N.E.2d 1010, 1016 (Ind.Ct.App.1995) (noting that "motive, as opposed to intent, is not an element of a crime."), *trans. denied.* The only reasonable inference that can be drawn from the evidence is that Frentz knowingly or intentionally killed Reynolds by firing three shots from the SKS semiautomatic assault

---

**10.** The *Lane* court noted that "[i]mproper joinder does not, in itself, violate the Constitution. Rather, misjoinder would rise to the level of a constitutional violation only if it results in prejudice so great as to deny a defendant his Fifth Amendment right to a fair trial." 474 U.S. at 446 n. 8, 106 S.Ct. 725.

**11.** We note that Frentz also claimed self-defense and argued to the jury that the State could have charged him with voluntary manslaughter or reckless homicide. There was no evidence of a struggle or sudden heat,. and the fact that Frentz shot Reynolds three times with the semiautomatic rifle, including twice in the chest at point-blank range, belies any claim of recklessness.

rifle at close range. *See Driver v. State*, 760 N.E.2d 611, 612 (Ind.2002) ("The intent to kill may be inferred from the deliberate use of a deadly weapon in a manner likely to cause death or serious injury."). As such, we conclude that any error in the trial court's denial of Frentz's motions to sever the drug counts from the murder count was harmless.

## II. Denial of Motions for Mistrial

■ Next, Frentz asserts that the State "flagrantly and deliberately" violated the trial court's orders in limine on three separate occasions. Appellant's Br. at 30. Frentz characterizes these violations as prosecutorial misconduct and claims and that the trial court committed reversible error in denying his ensuing motions for mistrial.

When reviewing an allegation of prosecutorial misconduct, we make two inquiries. First, we determine by reference to case law and rules of conduct whether the prosecutor engaged in misconduct, and, if so, we next determine whether the misconduct, under all of the circumstances, placed the defendant in a position of grave peril to which he or she would not have been subjected. The gravity of the peril is measured by the probable persuasive effect of the misconduct on the jury's decision rather than the degree of impropriety of the conduct.

*Ramsey v. State*, 853 N.E.2d 491, 498 (Ind. Ct.App.2006) (citation omitted), *trans. denied.*

Whether to grant or deny a motion for mistrial is a decision left to the sound discretion of the trial court. We will reverse the trial court's ruling only upon an abuse of that discretion. We afford the trial court this deference on appeal because the trial court is in the best position to evaluate the relevant circumstances of an event and its impact on the jury. . . .

A mistrial is an extreme sanction warranted only when no other cure can be expected to rectify the situation. Reversible error is seldom found when the trial court has admonished the jury to disregard a statement made during the proceedings, because a timely and accurate admonition to the jury is presumed to sufficiently protect a defendant's rights and remove any error created by the objectionable statement.

*Lehman v. State*, 777 N.E.2d 69, 72 (Ind. Ct.App.2002) (citations omitted). We address each of Frentz's motions for mistrial below.

### A. Mention of Redacted Statements

■ Prior to their admission, Frentz's taped and transcribed statements to police had been redacted largely pursuant to the agreement of the parties in response to Frentz's motions in limine. In laying the foundation for the first statement, the following colloquy ensued between the prosecutor and Trooper Flick:

Q I wanna show you what I've marked as State's Exhibit 39 and ask you if you recognize that?

A Yes, sir.

Q And how so?

A This appears to be a tape.

Q All right, and pursuant to the previous orders entered by the Court, portions of that statement are not on that tape, is that correct?

A That is correct.

Q So what's what we would refer to as a redacted copy of the tape, is that right?

A Yes, sir, I believe that's the terminology used by the Court.

Q Meaning that parts of it have been omitted?

A  That's correct.

Q  And you've had an opportunity to listen to portions of that tape, is that correct?

A  That is correct.

Tr. at 1166–67.

At that point, Frentz's counsel requested a conference outside the jury's presence, during which he moved for mistrial based on the prosecutor's mention of the redactions. The prosecutor responded that counsel had not made contemporaneous objections to his questions and that his only intent had been to lay a proper foundation for the tape's admission. After Frentz's counsel agreed to stipulate to the foundation for the admissibility of the remaining statements, the trial court denied the motion for mistrial and admonished the jury as follows: "[Y]ou're not to speculate about any redaction that has occurred in the statement given to Officer Flick by the Accused. Any redaction that's been made has been made pursuant to Indiana law. You're not to speculate about that redaction." *Id.* at 1174.

■ We agree with the State that Frentz waived review of this issue by failing to make contemporaneous objections to the prosecutor's statements. *See Bayes v. State,* 779 N.E.2d 77, 81 (Ind.Ct.App.2002) ("As a general rule, the failure to object at trial results in a waiver of the issue on

appeal. A contemporaneous objection affords the trial court the opportunity to make a final ruling on the matter in the context in which the evidence is introduced.") (citation omitted), *trans. denied* (2003). Waiver notwithstanding, we further agree with the State that the trial court's admonishment was sufficient to remove any error created by the prosecutor's statements.[12] Moreover, we find merit in the State's contention that the prosecutor's statements were not misconduct, in that they properly laid a foundation for Frentz's statements, which had been altered pursuant to Frentz's motions in limine. *See* Ind. Evidence Rule 901(a) ("The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims."). Finally, as the State observes, "both the exhibit and the transcription contained obvious gaps where information was removed, and thus the jury would have been aware of the redaction in any event[.]" Appellee's Br. at 21. In short, we find no abuse of discretion here.

### B. Turner's Testimony that Frentz Planned to Have Woolsey Killed

■ During trial, the court granted Frentz's motion to exclude evidence that

---

**12.** Frentz cites *Lehman,* 777 N.E.2d 69, for the proposition that the admonishment was insufficient to cure any error. In that case, a police officer violated a motion in limine by remarking that the investigation of the defendant had uncovered nine other child molesting victims. The trial court denied the defendant's motion for mistrial and instructed the jury to disregard the officer's comment. On appeal, another panel of this Court stated, "The trial court made no observations regarding the effect this comment may have had on the jury, and the record does not disclose any consideration of this factor. Thus, we cannot

defer to the trial court's determination of this issue." *Id.* at 73. The *Lehman* court then determined that the officer's testimony was so "prejudicial and inflammatory" that it was "not persuaded that the admonishment cured the defect." *Id.* Here, the prosecutor's statements regarding the redaction of the tape are not even remotely as prejudicial and inflammatory as the officer's statement in *Lehman.* As such, the trial court's failure to make any observations regarding the effect of the prosecutor's statements on the jury does not give us cause for concern.

he had threatened to have Chuck Woolsey killed. As previously mentioned, Turner testified regarding Frentz's differing accounts of Reynolds's shooting and his offer to pay Turner to plant evidence of a burglary at the crime scene. Turner did not mention Woolsey by name. On cross examination, Frentz's counsel asked Turner which account of the shooting he had given his approval to. The following colloquy occurred:

A Well, considerin' Chuck had just been arrested for, you know, for four pounds of methamphetamines and . . .

Q (interjecting) Chuck who?

A Chuck Woolsey.

Q All right.

A You know . . .

Q (interjecting) Well, let's clear this up for them. You can say this, but you're talking about Chuck Woolsey, right?

A. Yeah.

Tr. at 1900. Turner stated that "anybody in that circle knew . . . that Mexicans were involved" in Woolsey's drug operation and that therefore he "liked" Frentz's story about Woolsey hiring Mexicans to kill Frentz for his life insurance policy, even though he knew "it wasn't true." *Id.* at 1901. Frentz's counsel also questioned Turner regarding his past and pending criminal prosecutions and his controversial role as an informant in a previous case.[13]

On redirect, the prosecutor asked Turner how the life insurance scheme was supposed to work:

A [Frentz] suspected Chuck and his girlfriend of having a, a . . . you know, relationship and he said that they couldn't be runnin' around together, you know, with [Frentz]. In [Frentz's] (inaudible) he wasn't gon-

na have, you know, one of his friends takin' his girlfriend, you know. So they knew they had to get him out of the way so they could live happily ever after and with his life insurance money pretty much.

Q But how was Mr. Frentz' [s] life insurance money . . . did he say how that would benefit Chuck Woolsey, that's what I can't figure out?

A No.

Q You don't know?

A (No response)

Q Okay. Now this . . . did we come lookin' for you for information about this case?

A No, sir.

Q Would it make sense that we'd come looking to you after what happened in the other case you give [sic] information on?

A No.

Q You actually made a request to see an officer, right?

A Yes.

Q To see Trooper Lamb, whom you trusted?

A Yes.

Q You told him you might have some information he be [sic] interested in about this case?

A Yes, sir.

Q So it wasn't like Bill or Mike came lookin' for you and, and . . .

A (interjecting) I got a hold of Trooper Lamb to begin with because [Frentz] was talkin' about havin' Chuck killed. That was why I contacted Trooper Lamb. It wasn't . . . it wasn't we . . .

*Id.* at 1923.

At that point, Frentz's counsel requested a conference outside the jury's pres-

---

13. *See Osborne v. State,* 805 N.E.2d 435 (Ind. Ct.App.2004), *trans. denied.*

ence, during which he moved for mistrial based on Turner's violation of the order in limine. The trial court questioned Turner, who stated,

> I thought that I was told not to say anything about Chuck and then [Frentz's counsel] started talkin' about Chuck and I thought well, maybe I was mistakin'. I, I, I didn't ... I don't know. I didn't mean ... I don't know what to say. I didn't do anything deliberately.

*Id.* at 1925. The court then questioned the prosecutor, who stated,

> I talked to Mr. Turner this morning and I indicated to him what the Court's motions [sic] in limine were, in particular to the threats made to, allegedly made by the defendant in regard to Mr. Woolsey. And we discussed that extensively. And I think if you'll remember in my direct exam, I don't believe he mentioned Mr. Woolsey's name at all. In fact, uh, and that's what he just testified that he didn't. Uh, so I think ... and I think his answer to my question was nonresponsive. I, I asked him if he went to the police in response to the cross examine by [Frentz's counsel], somehow alleging that we pulled everybody out of the cell to talk to 'em, and that was not true. What we did, what the State did was Mr. Turner and Mr. Brackett came forward and said they had information about the case and approached the police, the authorities about that information and what I was tryin' to establish on redirect was that he, in fact, approached Jonathan Lamb about giving information in this case. So the question was not intended to ... the question wasn't *why*, the question was *did* you approach Jonathan Lamb.

*Id.* at 1926 (emphases added).

■ Ultimately, the trial court denied the motion for mistrial and said that it would issue an admonishment, if requested. Frentz's counsel did not request an admonishment, and none was given. Consequently, Frentz has waived any claim of error regarding the denial of this motion for mistrial. *See Randolph v. State*, 755 N.E.2d 572, 575 (Ind.2001) (stating that refusal of an offer of admonishment constitutes a waiver of any error in the denial of the motion for mistrial). Waiver notwithstanding, we agree with the State that Turner's statement was not the result of prosecutorial misconduct. There is no indication that the State deliberately elicited Turner's nonresponsive answer, and Frentz's plan to kill Woolsey was never mentioned again during the lengthy trial. As such, the trial court did not abuse its discretion in denying Frentz's motion for mistrial.

## C. Evidence that Deputy Lashbrooks had Previously Visited Frentz's Residence

■ The trial court issued an order in limine excluding any evidence of Frentz's prior bad acts. During the State's case in chief, the prosecutor asked investigating officers whether they had encountered any vehicular or foot traffic on their way to Frentz's residence and whether they had been familiar with Frentz. Several officers stated that they did not know Frentz, and two officers stated that they knew him through family. When the prosecutor questioned Orange County Sheriff's Deputy James Lashbrooks, the following colloquy occurred:

Q Okay, did you know the defendant before January 24th, 2005?

A I only knew of him in regards to a previous call that I'd had out there.

Q Okay, without going into that ...

Tr. at 1028.

At that point, Frentz's counsel requested a hearing outside the jury's presence,

during which he moved for mistrial. Frentz's counsel characterized Deputy Lashbrooks's statement as a violation of the order in limine and argued that the jury would infer that Frentz had committed "some sort of prior criminal offense." *Id.* at 1029. The prosecutor responded that the previous call could have been innocuous, that no prior bad acts were mentioned, and that he had simply tried to establish whether and in what context Deputy Lashbrooks had previously known Frentz. The trial court denied the motion for mistrial and stated that it would admonish the jury to disregard Deputy Lashbrooks's statement. Frentz's counsel requested that the trial court not issue an admonishment, and the trial court complied with the request.

■ Once again, Frentz has waived any claim of error by refusing the trial court's offer to admonish the jury. *Randolph*, 755 N.E.2d at 575. Waiver notwithstanding, we conclude that the prosecutor did not commit misconduct merely by asking whether Deputy Lashbrooks had known Frentz prior to Reynolds's death. Deputy Lashbrooks's answer was both nonresponsive and nonspecific, and the prosecutor stopped him from elaborating any further. Therefore, we conclude that the trial court did not abuse its discretion in denying Frentz's motion for mistrial.

## III. Consecutive Sentences

At Frentz's sentencing hearing, the trial court found two aggravating circumstances: (1) that Frentz had three prior substance-related convictions;[14] and (2) that he had been in a position of trust with Reynolds. The trial court found two mitigating circumstances: (1) that incarceration would impose a hardship on Frentz and his elderly parents; and (2) that Frentz was unlikely to commit another murder. The court found the aggravators and mitigators to be in equipoise with respect to the murder conviction and sentenced Frentz to the presumptive term of fifty-five years.[15] The court sentenced Frentz to the presumptive term of four years for the class C felony methamphetamine and cocaine convictions and to a slightly enhanced term of two years for the class D felony marijuana conviction,[16]

---

14. At the sentencing hearing, the trial court admitted over Frentz's objection three exhibits regarding Frentz's 1981 guilty plea conviction in Orange County for class B misdemeanor disorderly conduct (amended from class B misdemeanor public intoxication), his 1992 misdemeanor conviction in Kentucky for possession of a controlled substance (amended from trafficking in cocaine), and his 2001 conviction in Orange County for class C misdemeanor operating while intoxicated. *See* Tr. at 2191 (admission of exhibits); *see also* Appellant's App. at 1397–98 (pre-sentence investigation report detailing Frentz's criminal history). On appeal, Frentz asserts that "he only has a conviction for one misdemeanor for public intoxication from 1986." Appellant's Br. at 40. Because Frentz does not challenge the admissibility of the exhibits, we must disregard this assertion.

15. *See* Ind.Code § 35–50–2–3(a) (prior to April 25, 2005) ("A person who commits murder shall be imprisoned for a fixed term of fifty-five (55) years, with not more than ten (10) years added for aggravating circumstances or not more than ten (10) years subtracted for mitigating circumstances."). Frentz committed his crimes prior to our legislature's amendment of Indiana's sentencing statutes effective April 25, 2005. Given "the long-standing rule that the sentencing statute in effect at the time a crime is committed governs the sentence for that crime[,]" *Gutermuth v. State*, 868 N.E.2d 427, 431 n. 4 (Ind.2007), we review Frentz's claims pursuant to the sentencing statutes in effect prior to April 25, 2005.

16. *See* Ind.Code § 35–50–2–6(a) ("A person who commits a Class C felony shall be imprisoned for a fixed term of four (4) years, with not more than four (4) years added for aggravating circumstances or not more than two (2) years subtracted for mitigating circum-

to be served concurrent to each other. The court ordered these terms to be served consecutive to the murder sentence based on the aggravating circumstance of Frentz's criminal history.

▮▮▮▮ We first address Frentz's contention that the trial court erred in imposing consecutive sentences. "Sentencing decisions rest within the sound discretion of the trial court and we review them only for abuse of discretion." *Johnson v. State,* 725 N.E.2d 864, 868 (Ind.2000). "In order to impose consecutive sentences, the trial court must find at least one aggravating circumstance." *Marcum v. State,* 725 N.E.2d 852, 864 (Ind.2000). Frentz claims that his criminal history, which consists of three substance-related misdemeanor convictions, was an improper aggravating circumstance. Appellant's Br. at 40–41 (citing, *inter alia, Traylor v. State,* 817 N.E.2d 611, 622 (Ind.Ct.App.2004), and *Howell v. State,* 859 N.E.2d 677, 685–86 (Ind.Ct.App.2006), *trans. denied* (2007)).

We disagree. In the cases Frentz cites, the appellants' misdemeanor convictions were "not sufficiently weighty or similar to the current offense[s]" to justify imposing substantially enhanced sentences. *Howell,* 859 N.E.2d at 686.[17] Here, Frentz's prior substance-related convictions from 1981, 1992, and 2001 are similar to his drug possession convictions in this case, and the consecutive sentence for those convictions added only four years to his presumptive fifty-five-year murder sentence.

As for Frentz's suggestion that his prior convictions are too stale to justify consecutive sentences, our supreme court has stated,

> The chronological remoteness of a defendant's prior criminal history should be taken into account. However, we will not say that remoteness in time, to whatever degree, renders a prior conviction irrelevant. The remoteness of prior criminal history does not preclude the trial court from considering it as an aggravating circumstance.
>
> The trial court could view the remoteness of the defendant's prior criminal history as a mitigating circumstance, or on the other hand, it could find the remoteness to not affect the consideration of the criminal history as an aggravating circumstance. Either opinion by a trial court would be within the ambit of its discretion.

*Buchanan v. State,* 767 N.E.2d 967, 972 (Ind.2002) (citations and quotation marks omitted). Obviously, the chronological remoteness of Frentz's prior convictions did not affect the trial court's consideration of his criminal history as an aggravating circumstance, and we cannot say that the trial court abused its discretion in this regard. Frentz's convictions, spaced evenly over two decades, demonstrate a long-standing history of substance abuse that went unchecked until he was jailed for the instant offenses in January 2005. Because a single aggravator is sufficient to support consecutive sentences, we need not address Frentz's claim regarding the propriety of the "position of trust" aggravator *vis-à-vis Blakely v. Washington,* 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004).

stances.''); Ind.Code § 35–50–2–7(a) ("A person who commits a Class D felony shall be imprisoned for a fixed term of one and one-half (1½) years, with not more than one and one-half (1½) years added for aggravating circumstances or not more than one (1) year subtracted for mitigating circumstances.'').

**17.** The defendant in *Traylor* was sentenced to forty years for a class A felony and six years for a class C felony. The defendant in *Howell* received the maximum eight-year sentence for a class C felony.

As a final consideration, we observe that Frentz does not challenge the trial court's imposition of consecutive sentences based on his criminal history, notwithstanding its determination that the mitigators and aggravators (including his criminal history) were in equipoise with respect to his murder conviction. A recent opinion issued by another panel of this Court suggests that the trial court's imposition of consecutive sentences in this case would be improper in the absence of an additional aggravating circumstance. *See Feeney v. State,* 874 N.E.2d 382 (Ind.Ct.App.2007).

In *Feeney,* the defendant was convicted of ten counts of class B felony burglary, all committed when he was eighteen years old. At the sentencing hearing, the trial court remarked, " 'I think that the number, the sheer number of burglaries requires something more than the minimum sentence and requires consecutive sentences.' " *Id.* at 384 (citation omitted).

In its written sentencing statement, the trial court identified three aggravating circumstances: the number of burglaries, Feeney's lack of candor in his "cleanup statement" and polygraph examination, and the fact that Feeney had been selling drugs. Furthermore, despite its suggestion at the sentencing hearing that Feeney's young age is not a mitigating factor given the circumstances of this case, the trial court identified Feeney's age as a mitigating factor. Finally, the court found that "the mitigating factors and aggravating factors balance."

*Id.* (citation omitted). The trial court imposed a ten-year advisory sentence on each count, then ordered four of the terms to be served consecutively and the rest concurrently, for an aggregate sentence of forty years.

On appeal, the defendant challenged the appropriateness of his sentence pursuant to Indiana Appellate Rule 7(B). The *Feeney* panel stated,

Before turning to the merits of Feeney's inappropriateness argument, we pause to comment on the trial court's imposition of consecutive sentences. In its written sentencing statement, the trial court explicitly found that "the mitigating factors and aggravating factors balance." Tr. at 132. Indiana's appellate courts have consistently held that when the trial court finds the aggravating and mitigating circumstances to be in balance, "there is no basis on which to impose consecutive terms." *Wentz v. State,* 766 N.E.2d 351, 359 (Ind.2002), *reh'g denied* (quoting *Marcum v. State,* 725 N.E.2d 852, 864 (Ind.2000), *reh'g denied*). Nonetheless, the trial court ordered four of Feeney's ten-year sentences to run consecutively. Ordinarily, such an order would require remand for the imposition of concurrent sentences. But this is not an ordinary case.

*Id.* at 384–85. The panel noted inconsistencies between the trial court's oral and written sentencing statements and stated, "we cannot decipher whether the trial court's imposition of consecutive sentences represents a simple error of law or if it implies a finding that the aggravators actually outweigh the mitigators." *Id.* at 385. In an ensuing footnote, the panel stated,

This case is distinguishable from two recent opinions from this Court in which we affirmed the imposition of consecutive sentences where the trial court found certain aggravating and mitigating circumstances to be in balance but then went on to find the existence of multiple victims to constitute an additional aggravating circumstance. *See Lopez v. State,* 869 N.E.2d 1254, 1258–59 (Ind.Ct.App.2007), *trans. pending; Gleaves v. State,* 859 N.E.2d 766, 771

(Ind.Ct.App.2007). Here, the trial court did not find the existence of multiple burglaries as an "additional" aggravating circumstance. Indeed, the trial court found the number of burglaries as one of the three aggravating factors that balanced with the mitigating factor of Feeney's age.

*Id.* at n. 6.[18] The panel then stated, "Under these circumstances, we could remand this case to the trial court for a new sentencing statement that clearly explains its finding of aggravating and mitigating circumstances and its reasons for imposing consecutive sentences." *Id.* at 385. Instead, the panel exercised its authority to review and revise sentences pursuant to Appellate Rule 7(B) and revised Feeney's sentence to fourteen years.

■ We respectfully disagree with the *Feeney* panel's analysis. We find no basis for holding that a trial court is restricted to a one-step balancing process when sentencing a defendant for multiple crimes. We believe that it is permissible for a trial court to consider aggravators and mitigators in determining the sentence for each underlying offense and then to independently consider aggravators and mitigators in determining whether to impose concurrent or consecutive sentences. The imposition of presumptive, or now advisory, sentences on the underlying individual offenses does not preclude those sentences from being imposed as consecutive sentences. To conclude otherwise would be to give a defendant a "free pass" for committing multiple crimes and harming multiple victims. As trial courts are acutely aware, sentencing is not a mechanical process, and we find no error in the process that Special Judge Lopp used in imposing consecutive sentences in this case.

## IV. Appropriateness of Sentence

■ Finally, we address Frentz's claim that his fifty-nine-year aggregate sentence is inappropriate. Indiana Appellate Rule 7(B) provides that this Court "may revise a sentence authorized by statute if, after due consideration of the trial court's decision, the Court finds that the sentence is inappropriate in light of the nature of the offense and the character of the offender." "[A] defendant bears the burden of persuading the appellate court that his or her sentence is inappropriate." *Stewart v. State,* 866 N.E.2d 858, 866 (Ind. Ct.App.2007).

Frentz notes that he was over fifty years old when he committed the offenses and had never been charged with a violent offense. He also observes that he had quit drinking "cold turkey" after three decades of alcoholism and appeared to be disoriented and remorseful in the aftermath of Reynolds's death. That being said, Frentz shot his close friend and housemate three times at close range with an assault rifle, planted a rifle underneath his body, lied to police about his death, and asked fellow

---

**18.** In a concurring opinion, Senior Judge Sullivan stated,

The trial court specifically and clearly found that the aggravators and mitigators were in balance. From this, I am unable to conclude as does the majority that the court may well have determined to the contrary and that the "aggravators actually outweigh the mitigators."

I do however agree that the court did not use a free-standing "additional" aggravator as the basis for imposing consecutive sentences. The court utilized the "sheer number of burglaries" both as an aggravating circumstance in its balancing process and then re-used the same aggravator to impose consecutive sentences. This case, as noted by the majority, is therefore to be distinguished from *Lopez v. State,* 869 N.E.2d 1254 (Ind.Ct.App.2007).

*Feeney,* 874 N.E.2d at 386 (Sullivan, S.J., concurring) (citation omitted).

prisoners to plant evidence of a burglary at the crime scene. Police found drugs in plain view in Frentz's home, which indicates that Frentz had learned very little from his previous run-ins with law enforcement. After due consideration of the trial court's decision, we cannot say that Frentz's fifty-nine-year sentence is inappropriate in light of the nature of the offenses and his character. In sum, we affirm Frentz's convictions and sentence.

Affirmed.

BAKER, C.J., and FRIEDLANDER, J., concur.