**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



ATTORNEY FOR APPELLANT:

**MARK SMALL**
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**JODI KATHRYN STEIN**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| DAVID MARK FRENTZ, | ) | |
| | ) | |
| Appellant-Petitioner, | ) | |
| | ) | |
| vs. | ) | No. 59A01-1207-PC-334 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Respondent. | ) | |

APPEAL FROM THE ORANGE CIRCUIT COURT
The Honorable Frank Newkirk, Jr., Special Judge
Cause No. 59C01-1008-PC-91

**May 31, 2013**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**NAJAM, Judge**

**STATEMENT OF THE CASE**

David Mark Frentz appeals the post-conviction court's denial of his petition for post-conviction relief. Frentz raises three issues for our review, which we restate as follows:

1.  Whether his trial counsel rendered ineffective assistance when he told the jury during his opening statement that he agreed with 99% of the State's case;

2.  Whether his trial counsel rendered ineffective assistance when he did not pursue an insanity defense; and

3.  Whether Frentz preserved for appellate review a potential claim in the selection of the jury, which he did not raise in his petition for post-conviction relief.

We affirm.

**FACTS AND PROCEDURAL HISTORY**

The facts underlying Frentz's convictions were stated by this court on direct appeal:

> The facts most favorable to the jury's verdict indicate that twenty-three-year-old Zackary Reynolds lived with the fifty-three-year-old Frentz and worked on his Orange County farm. On Saturday, January 22, 2005, Frentz's doctor told him that he would die if he did not stop drinking. Frentz had been drinking for thirty years and quit "cold turkey" that day. Frentz's doctor gave him pills to alleviate "the DT's[.]" On Sunday, January 23, Frentz ran some errands, came home to work on a pickup truck with Reynolds, and then ran additional errands. On his way home, Frentz stopped at a fast-food drive-through in Salem between 10:00 and 11:00 p.m. While there, he talked on his cell phone with his friend Carl Brock. Frentz told Brock that he had been "feeling bad" and had been hallucinating, with "either light poles or salt shakers dancing or something like that, uh, dogs running across the road laughing at him and stuff like that." Brock became concerned and asked Frentz to call him when he got home.

2

Brock went online for an hour or two, thereby tying up his telephone line. Brock then called Frentz's cell phone. Frentz asked both Brock and his wife if they had heard from his ex-girlfriend, Dusty Austin, with whom he had broken up several weeks earlier. Frentz stated that he had been "fucked over" by his long-time friend Chuck Woolsey, who he thought was having a sexual relationship with Austin. During the course of the conversation, Frentz went from "feeling ill and hallucinating to someone who was very sober and [not] really talkative at all." In an attempt to smooth things over, Brock made some humorous remarks. Frentz hung up. Brock believed that Frentz had "snapped" and tried calling him several times, to no avail.

At approximately 3:00 a.m. on Monday, January 24, Frentz's neighbor Debra Sayles drove by his house on her way home from work and noticed that all the lights were on, which was not unusual. At approximately 3:30 a.m., Brock finally reached Frentz by telephone. Frentz was "freaked out" and told Brock to call the police. Frentz told Brock that "he put PCP in that shit and people [are] up here to fuck with us." Frentz "said something about [who's] out there, get back in here, who broke that light." Frentz "kept hollering" at Reynolds, but Brock never heard Reynolds reply. Brock offered to pick up Frentz, and Frentz agreed. When Brock asked to talk to Reynolds, Frentz hung up. As Brock got dressed, his wife called Frentz and asked to talk to Reynolds. Frentz hung up again. Brock then called a phone number that Austin had given him after breaking up with Frentz. Woolsey answered the phone. Brock told Woolsey to tell Austin that Frentz had "snapped." Brock's wife refused to let Brock go to Frentz's home.

Early that morning, two of Frentz's neighbors saw and heard what appeared to be Frentz's pickup truck driving down the road at a high rate of speed. At approximately 5:30 a.m., Frentz called 911 on his cell phone and stated that several people were trying to break into his house. The phone line went dead several times during the course of the call. Frentz reported that the intruders had broken into the house, that one of the intruders was shooting, that his friend had been shot in the chest, that his friend was still breathing, that the intruders were still in the home, that the intruders were "trying to get in the windows" and doors, and that he had "locked the door back." The call ended when the operator confirmed with Frentz that assistance had arrived.

Officers from Washington and Orange Counties responded to Frentz's 911 call. None of them observed any vehicle or foot traffic or anything unusual on their way to Frentz's home. They saw Frentz standing in the kitchen. Appearing disoriented and agitated, Frentz opened the door

3

and motioned for them to come in. One of the officers saw an SKS assault rifle lying on a kitchen chair and "secured it" for their safety. The SKS was a semiautomatic firearm, which fires a bullet each time the trigger is pulled. Another officer handcuffed Frentz, who was dressed in underwear and a t-shirt and was "sweating really bad." Frentz told the officers that Mexicans on motorcycles had broken into his house and that there was someone in his bed. The officers found no one in Frentz's bed and no signs of a struggle or forced entry.

From the kitchen, a third officer saw Reynolds lying face-up in a hallway in a pool of blood, on top of a loaded .22–caliber rifle. Reynolds's body was cool to the touch and showed no signs of life. He had been struck by three bullets: one that passed through his right wrist and deeply grazed his right abdomen; a second that entered the middle of his chest, lacerated his liver and adrenal gland, and lodged near his spine; and a third that entered the upper right side of his chest, fractured the ribs and collarbone, extensively damaged his right lung, and exited above the scapula. The two chest wounds exhibited stippling from gunshot residue, which indicated that the firearm's muzzle had been within two feet of Reynolds when the bullets were fired. All the wounds were lethal, and Reynolds bled to death within minutes. A toxicology exam revealed traces of methamphetamine and amphetamine in Reynolds's blood. A ballistics test established that the bullet that lodged near Reynolds's spine was fired from the SKS. Genetics testing revealed traces of Reynolds's DNA on Frentz's t-shirt. In the hallway, police recovered four shell casings of the same caliber as the SKS. Three bullets had penetrated the closet door in front of which Reynolds had been standing when he was shot. Police noticed that Reynolds's bedroom window had been shot through several times from the inside and found similar shell casings nearby.

Orange County Sheriff's Detective Michael Dixon arrived and asked another officer to Mirandize Frentz and remove his handcuffs. Detective Dixon then questioned Frentz about the incident. Frentz stated that he had been asleep in his bedroom and heard a scuffle at the other end of the house. He grabbed the .22, walked down the hallway, and saw two Hispanic men exiting the back door. Frentz saw Reynolds fighting with a third Hispanic man over the SKS. Frentz set the .22 down, grabbed the intruder, and heard two gunshots. The intruder left the home and drove away with his companions in a sport utility vehicle. Frentz stated that the three men had broken into his home through a window.

Thereafter, Indiana State Trooper Bill Flick transported Frentz to Detective Dixon's office for an interview. Frentz read and signed an advisement of rights form. Frentz told Trooper Flick that when he went to

bed at 11:00 on Saturday evening, Reynolds was playing cards and drinking beer with two unknown young white men at the kitchen table. Between 4:30 and 5:30 a.m., Frentz heard Reynolds yell and saw three Hispanic men, two of whom went out the back door. Frentz grabbed the .22, called 911, and went into the hallway, where Reynolds was scuffling with the third intruder over the SKS. Frentz placed the .22 on the floor, grabbed the intruder, and heard a gun go off. The intruder went out the back door. Frentz heard a motorcycle and saw a black sport utility vehicle drive off. Frentz heard someone outside the house and fired shots through the window and out the back door.

At Frentz's home, police found marijuana in plain view and obtained a search warrant. Police found a total of 39.49 grams of marijuana in a mug near the kitchen, underneath Frentz's mattress, in a sewing basket, and in a jar wrapped with black electrician's tape. Police also found cocaine residue in a one-hitter above the refrigerator, as well as methamphetamine residue on a mirror next to a rolled-up dollar bill in a kitchen cabinet. A toxicology exam revealed traces of ephedrine and cocaine metabolites in Frentz's blood. At trial, the court excluded Frentz's toxicology report pursuant to a motion in limine.

After further investigating the scene and questioning Frentz's mother, Trooper Flick and Detective Dixon interviewed Frentz a second time that same day. Frentz told the officers that he had stopped drinking "cold turkey" on Saturday after thirty years and had been given medication. He denied telling his mother that he was hallucinating and claimed that he had told her he felt "fuzzy" from the medication. Frentz stated that Reynolds had been "just outside of his door" when he was shot and that he remembered hearing three gunshots. He stated that he put his hands "over [Reynolds's] bleeding" at the urging of the 911 operator and that he loved Reynolds "like my boy." Frentz spent the night in the Orange County jail.

The following morning, Frentz asked to speak with Trooper Flick. Frentz told Trooper Flick that he had taken his medication the night before and experienced hallucinations. He stated that "it was like [the medication] was givin' [him] the DT's" instead of taking them away. He further stated that Reynolds had purchased drugs that weekend from someone who was interested in Austin, his ex-girlfriend. Frentz wondered if that person might have altered the drugs and persuaded Reynolds to "slip [him] some[.]" Frentz denied that his medication and any altered drugs he might have ingested might have caused him "to just randomly start shootin' that rifle[.]"

5

While in jail, Frentz discussed Reynolds's shooting with fellow prisoners and serial felons Troy Brackett and David Turner. Frentz told Brackett that A.J. Guthrie and Eric Lloyd had sold methamphetamine to Reynolds and then attempted to steal it back. During the ensuing struggle, Reynolds was accidentally shot. Later, Frentz told Brackett that he and Reynolds had argued about the drug purchase from Guthrie and Lloyd, who had bought the drugs from Woolsey, who was living with Austin. Frentz said that he heard a noise that night that "played to his role" and shot Reynolds with an SKS. Frentz told Brackett that Reynolds "shouldn't have been messing with [his] old lady."

Frentz told Turner that he had come home on Sunday evening to find Reynolds with Guthrie and Lloyd. Reynolds offered Frentz methamphetamine, which he declined. Frentz went to bed, then got back up and told Reynolds that it was not a good idea to have "all that meth" in front of Guthrie and Lloyd. Guthrie and Lloyd later broke in to steal the methamphetamine, resulting in a struggle that claimed Reynolds's life. Frentz asked Turner what he thought of the story. Turner replied that if he were on a jury, he would convict Frentz. Later, Frentz told Turner that Woolsey and Austin had hired Mexicans to break into his home and kill him for his life insurance policy and that they had shot the wrong person. Frentz then told Turner that he had sent Reynolds to persuade Austin to return to Frentz's home. Reynolds was gone for a long time, and Frentz began to suspect that he and Austin were romantically involved. That night, Frentz looked out his window and saw Austin standing behind a telephone pole. He thought that she and Reynolds were going to run off together, which "ticked him off[.]" He grabbed a gun, confronted Reynolds, and shot him. Frentz realized that "he'd messed up pretty bad" and shot Reynolds twice more to kill him. Frentz said that he placed the .22 underneath Reynolds's body and drove his truck up and down the road several times to make the neighbors think "that they heard several vehicles leaving his place at a high rate of speed[.]" Frentz kept changing his story until he finally got Turner's approval.

Frentz offered to pay Brackett and Turner to drop .45–caliber shells outside his house and put pry marks outside the windows. He also told both men that his brother had entered his home and retrieved $700 in cash from his jacket pocket and an ounce of methamphetamine from his jeans pocket, which his brother flushed down the toilet. Frentz's brother and sister-in-law did in fact find over $600 in cash in Frentz's jeans pocket while cleaning his house after the shooting.

While in jail, Frentz received a letter from Reynolds's father with Reynolds's obituary and a sarcastic request to help pay the funeral

expenses. Frentz threw the obituary on the floor and told Brackett that "if he was going to pay for [Reynolds's] funeral he would have never killed him." Frentz told Turner that Reynolds's relatives were "[m]oney-hungry son-of-a-bitches."

On January 27, 2005, the State charged Frentz with murder, class C felony methamphetamine possession, class C felony cocaine possession, and class D felony marijuana possession. On March 16, 2005, the State amended the information to include class C felony anhydrous ammonia possession and class D felony receiving stolen property. On May 27, 2005, Frentz filed a motion to sever the illicit substance counts from the murder count, which the trial court denied. On January 3, 2006, Frentz renewed his motion to sever, which the trial court granted in part by severing the anhydrous ammonia possession and receiving stolen property counts from the remaining counts.

Frentz's jury trial lasted from March 27, 2006, to April 10, 2006, during which Frentz unsuccessfully renewed his motion to sever. In his opening statement, Frentz's counsel said, "[W]e agree with ninety-nine percent of what the State says, probably 99.9 percent of what the State says." Frentz's counsel acknowledged that there were no signs of a struggle on the night of the shooting and that the evidence did not support Frentz's version of events. Detective Dixon agreed with Frentz's counsel's statement that the physical evidence indicated that Reynolds "was shot outside of his door standing up, fairly quickly, and that [Frentz] seemed to be the only one in the residence[.]"

After the close of evidence, the State requested an instruction on the lesser-included offense of voluntary manslaughter. Frentz's counsel objected, arguing that there was no evidence of sudden heat to warrant such an instruction. Counsel then elicited sworn testimony from Frentz that he did not want either side to request instructions on a lesser-included offense. The trial court found no serious evidentiary dispute as to the existence of sudden heat and denied the State's request for a voluntary manslaughter instruction. The jury found Frentz guilty as charged.

On September 5, 2006, the trial court sentenced Frentz to fifty-five years for murder. The court also sentenced Frentz to four years for methamphetamine possession, four years for cocaine possession, and two years for marijuana possession, to be served concurrent [with] each other and consecutive to the murder sentence, for an aggregate term of fifty-nine years. . . .

7

Frentz v. State, 875 N.E.2d 453, 457-61 (Ind. Ct. App. 2007) (citations and footnotes omitted; alterations original), trans. denied ("Frentz I").

On direct appeal, Frentz raised four issues: whether the trial court erred when it joined and then denied Frentz's motions to sever the drug possession counts from the murder count; whether the trial court abused its discretion when it denied Frentz's motions for a mistrial based on various allegations of prosecutorial misconduct; whether the trial court abused its discretion when it sentenced Frentz; and whether Frentz's sentence was inappropriate under Indiana Appellate Rule 7(B). In considering those issues, we stated: "The evidence that Frentz possessed methamphetamine, cocaine, and marijuana was overwhelming. So, too, was the evidence that Frentz was the person who shot and killed Reynolds. The only issue in dispute was whether Frentz knowingly or intentionally killed Reynolds." Id. at 464. We affirmed Frentz's convictions and sentence.

On December 11, 2008, Frentz filed his petition for post-conviction relief, which he later amended. The post-conviction court held an evidentiary hearing on Frentz's petition on March 15, 2012, after which the court issued findings of fact and conclusions of law denying Frentz's petition. This appeal ensued.

**DISCUSSION AND DECISION**

**Standard of Review**

Frentz appeals the post-conviction court's denial of his petition for relief. Our standard of review is well established:

> [The petitioner] bore the burden of establishing the grounds for post-conviction relief by a preponderance of the evidence. See Ind. Post-

8

Conviction Rule 1(5); Timberlake v. State, 753 N.E.2d 591, 597 (Ind. 2001). Post-conviction procedures do not afford a petitioner with a super-appeal, and not all issues are available. Timberlake, 753 N.E.2d at 597. Rather, subsequent collateral challenges to convictions must be based on grounds enumerated in the post-conviction rules. Id. If an issue was known and available, but not raised on direct appeal, it is waived. Id. If it was raised on appeal, but decided adversely, it is res judicata. Id.

In reviewing the judgment of a post-conviction court, appellate courts consider only the evidence and reasonable inferences supporting the post-conviction court's judgment. Hall v. State, 849 N.E.2d 466, 468 (Ind. 2006). The post-conviction court is the sole judge of the evidence and the credibility of the witnesses. Id. at 468-69. Because he is now appealing from a negative judgment, to the extent his appeal turns on factual issues [the petitioner] must convince this court that the evidence as a whole leads unerringly and unmistakably to a decision opposite that reached by the post-conviction court. See Timberlake, 753 N.E.2d at 597. We will disturb the decision only if the evidence is without conflict and leads only to a conclusion contrary to the result of the post-conviction court. Id.

Lindsey v. State, 888 N.E.2d 319, 322 (Ind. Ct. App. 2008), trans. denied.

Frentz's arguments on appeal are premised on his theory that he was denied the effective assistance of trial counsel. A claim of ineffective assistance of counsel must satisfy two components. Strickland v. Washington, 466 U.S. 668 (1984). First, the defendant must show deficient performance: representation that fell below an objective standard of reasonableness, committing errors so serious that the defendant did not have the "counsel" guaranteed by the Sixth Amendment. Id. at 687-88. Second, the defendant must show prejudice: a reasonable probability (i.e., a probability sufficient to undermine confidence in the outcome) that, but for counsel's errors, the result of the proceeding would have been different. Id. at 694. We afford counsel considerable discretion in choosing strategy and tactics, and "'[i]solated mistakes, poor strategy, inexperience, and instances of bad judgment do not necessarily render representation ineffective.'" State v.

9

<u>Hollin</u>, 970 N.E.2d 147, 151 (Ind. 2012) (quoting <u>Timberlake</u>, 753 N.E.2d at 603) (alteration original to <u>Hollin</u>).

Here, Frentz alleges he was denied the effective assistance of counsel for the following three reasons: (1) his trial counsel conceded Frentz's guilt when he told the jurors during his opening statement that he "agree[d] with ninety-nine percent of what the State says, probably 99.9 percent of what the State says," see <u>Frentz I</u>, 875 N.E.2d at 461; (2) his trial counsel failed to pursue an insanity defense; and (3) his counsel failed to object when prospective jurors were dismissed from January 2006 and summoned then again for trial in March 2006. We address each of Frentz's arguments in turn.

**Issue One: Opening Statement**

Frentz first asserts that his trial counsel's opening statement, in effect, told the jury that there was no reasonable doubt that the State's case was correct. In support of his position, Frentz relies on various authorities that have disapproved of quantifying the reasonable doubt standard for jurors. See, e.g., <u>State v. Boyd</u>, 331 N.W.2d 480, 482 (Minn. 1983) (discussing, among other authorities, Laurence H. Tribe, Trial by Mathematics, 84 Harv. L. Rev. 1329 (1971)). But his trial counsel's opening statement was not a commentary on the reasonable doubt standard.

Rather, in a case in which the State had overwhelming physical evidence against his client, see <u>Frentz I</u>, 875 N.E.2d at 474, Frentz's trial counsel sought to bolster his client's credibility with the jury by frankly acknowledging the weight of the State's physical evidence. As we have recognized:

> concession by an attorney to certain elements of a charge or even to an entire charged offense may at times constitute a reasonable trial strategy.

10

> For instance, concession to a particular fact or charge that is supported by overwhelming evidence may help enhance a defendant's credibility on the remaining issues at trial.

Christian v. State, 712 N.E.2d 4, 6 (Ind. Ct. App. 1999). That strategy is all that is reflected by Frentz's counsel's opening statement. Frentz's attempt to spin those comments into a concession that he was guilty beyond a reasonable doubt is not persuasive. As the post-conviction court found: "Counsel . . . did not by his opening statement admit [an] element of the offense, concede reasonable doubt or relieve the State of the necessity of establishing its case." Appellant's App. at 49.

Neither is it relevant that Frentz's trial counsel later testified before the post-conviction court that he could not recall the strategy for the opening statement. We review the post-conviction court's judgment in light of the evidence most favorable to that judgment. Lindsey, 888 N.E.2d at 322. Frentz's argument is merely a request for this court to reweigh the evidence before the post-conviction court, which we will not do. See id.

### Issue Two:  Insanity Defense

Frentz next asserts that his counsel was ineffective because he did not raise an insanity defense during trial. "The decision to interpose the insanity defense is a matter which requires trial counsel to exercise his professional skills and judgment. Trial counsel's decision not to raise the insanity defense is a matter of strategy and does not support a claim of ineffective assistance of counsel." Osborne v. State, 481 N.E.2d 376, 380 (Ind. 1985).

Notably, Frentz acknowledges that his trial counsel did file a Notice of Defense of Mental Disease or Defect at the outset of the proceedings and that he investigated the potential for this defense. As the post-conviction court found: "Counsel . . . did investigate the defense of not guilty by reason of insanity but after litigating the issue through pre-trial pleadings and hearings made a strategic decision that it was not in [Frentz's] best interest[s] to pursue that defense." Appellant's App. at 50. In particular, Frentz's trial counsel had Frentz evaluated by Dr. Phillip Coons. Frentz's trial counsel made the strategic decision not to pursue the defense shortly thereafter.

At the evidentiary hearing before the post-conviction court, Frentz presented the testimony of Dr. Ned Masbaum in support of his position that he was insane when he murdered Reynolds. According to the post-conviction court:

66.    Dr. Masbaum testified that he interviewed [Frentz] for approximately two hours nearly five years after the date of the charging information[].

67.    Dr. Masbaum also testified that [Frentz] was the only person he interviewed and that he had not reviewed the reports of the lead detectives, Mike Dixon and Bill Flick.

68.    Dr. Masbaum concluded that [Frentz] "was of unsound mind at the time of the Offenses" based upon a diagnosis of delirium tremens.

* * *

89.    Dr. M[a]sbaum testified that he had reviewed various documents related to the case, including the probable cause affidavit and Mr. Frentz's medical records. He also admitted that he did not meet with or examine Mr. Frentz near the time of the killing or arrest, he did not review all relevant documents and he did not interview all knowledgeable witnesses or review their testimony.

12

90. Dr. M[a]sbaum testified that, to a reasonable degree of medical certainty, Mr. Frentz had been insane on the night of the shooting of Zack Reynolds.

91. Dr. M[a]sbaum's conclusion was based upon selective and incomplete information.

92. [Frentz] has failed to show a "reasonable probability" . . . that the result of the proceeding would have been different . . . .

Id. at 55, 58.

On appeal from the post-conviction court's judgment, Frentz asserts that Dr. Masbaum's testimony demonstrates that his trial counsel should have continued to pursue an insanity defense through trial. Frentz further notes that his trial counsel testified to the post-conviction court that he could not recall the strategic reason for why the Notice of Defense was withdrawn.

Frentz's arguments on this issue are merely requests for this court to reweigh the evidence, which, again, we will not do. The post-conviction court discredited Dr. Masbaum's testimony because his conclusions were "based upon selective and incomplete information," and the court was not persuaded by Frentz's counsel's failure to recall the strategy for not pursuing an insanity defense. Id. at 58. Moreover, Frentz presented no evidence to the post-conviction court to demonstrate that the information available to his trial counsel at the time of trial showed that Frentz met the statutory criteria for this defense. Thus, Frentz cannot demonstrate that the post-conviction court erred when it denied his petition on this issue.

13

## Issue Three:  Jury Selection

Finally, Frentz asserts that his trial counsel rendered ineffective assistance when he did not object when prospective jurors who had been summoned and discharged in January 2006 were again called in March and served during Frentz's trial.  The State asserts that Frentz did not raise this issue in his petition for post-conviction relief, and the post-conviction court did not abuse its discretion when it denied Frentz's attempt to amend his petition during the evidentiary hearing.  We agree with the State.

Frentz did not raise this issue in his petition for post-conviction relief.  "Issues not raised in a petition for post-conviction relief may not be raised for the first time on appeal."  Emerson v. State, 812 N.E.2d 1090, 1098-99 (Ind. Ct. App. 2004).  Accordingly, this issue has not been preserved for appellate review.

On appeal, Frentz attempts to avoid his waiver by first asserting that he did raise this issue in his petition under the guise that his trial counsel was ineffective for not seeking a change in venue on the grounds of publicity.  We cannot agree that those are the same legal questions or that raising a venue issue put the State on proper notice that Frentz intended to raise a jury-selection issue.  And, in this appeal, Frentz does not challenge the venue of his trial.  Thus, this argument is without merit.

Frentz also argues that the "identity of the jurors as having been on the January panel was discovered only on the day of the evidentiary hearing."  Reply Br. at 9.  As such, he continues, he moved to amend his petition to conform with the evidence pursuant to Indiana Trial Rule 15(A), which requires a trial court to give leave to amend a pleading "when justice so requires."

Indiana Trial Rule 15(A) does not apply here. "While our Trial Rules generally only govern procedure and practice in civil cases, we have considered their applicability in post-conviction proceedings on a case-by-case basis where the Indiana Rules of Procedure for Post-Conviction Remedies are silent." Corcoran v. State, 845 N.E.2d 1019, 1021 (Ind. 2006). But our Post-Conviction Rules on the amendment of a petition for relief are not silent. Rather, Post-Conviction Rule 1(4)(c) states that, within sixty days of the evidentiary hearing, a motion to amend may be granted only "by leave of the court."

That rule explicitly leaves a decision on whether to amend a petition within sixty days of the evidentiary hearing in the post-conviction court's discretion. As our supreme court has explained:

> Prior to [1995], the Rule stated that "the petitioner shall be given leave to amend the petition as a matter of right." See Ind. Post-Conviction Rule 1(4)(c) (1994) (emphasis added). The Rule now provides that the "petitioner shall be given leave to amend the petition as a matter of right no later than sixty . . . days prior to the date the petition has been set for trial. Any later amendment of the petition shall be by leave of the court." (emphasis added). This change in Rule 1(4)(c) demonstrates our intent to grant the post-conviction court discretion when ruling on amendments within the 60-day period.

Tapia v. State, 753 N.E.2d 581, 586 n.7 (Ind. 2001). As such, we review the post-conviction court's denial of a motion to amend within sixty days of the evidentiary hearing for an abuse of discretion. Id. at 586.

The post-conviction court did not abuse its discretion when it denied Frentz's motion to amend his petition during the evidentiary hearing. Though Frentz asserts to this court that he did not discover the potential jury-selection issue until the evidentiary

15

hearing, he informed the post-conviction court that he was aware of this potential issue when he deposed his trial counsel in October of 2009. Specifically, Frentz's post-conviction counsel acknowledged that he "address[ed] the release of the jurors in January 2006" during the deposition of Frentz's trial counsel, more than a year before the post-conviction court's evidentiary hearing. PC Transcript at 96. Nonetheless, Frentz waited until the day of the evidentiary hearing to attempt to add this potential issue to his petition for relief. On these facts, we cannot say the post-conviction court abused its discretion when it denied Frentz's attempt to amend his petition at the last second. Hence, Frentz did not properly preserve this potential issue by raising it in his petition for post-conviction relief.

## Conclusion

In sum, Frentz cannot demonstrate that the post-conviction court erred when it denied his petition for relief.

Affirmed.

BAILEY, J., and BARNES, J., concur.