## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Sep 20 2016, 8:56 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

P. Jeffrey Schlesinger
Crown Point, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

George P. Sherman
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Cesar A. Castaneda, <br> *Appellant-Defendant,* <br><br> v. <br><br> State of Indiana, <br> *Appellee-Plaintiff.* | September 20, 2016 <br><br> Court of Appeals Case No. 45A05-1601-CR-25 <br><br> Appeal from the Lake Superior Court <br><br> The Honorable Salvador Vasquez, Judge <br><br> Trial Court Cause No. 45G01-1302-FA-6 |

**Riley, Judge.**

## STATEMENT OF THE CASE

Appellant-Defendant, Cesar A. Castaneda, Sr. (Castaneda), appeals his conviction for battery resulting in death, a Class A felony, Ind. Code § 35-42-2-1(a)(5) (2012); and neglect of a dependent, a Class D felony, I.C. § 35-46-1-4(a)(3) (2012).

We affirm.

## ISSUES

Castaneda raises two issues on appeal, which we restate as follows:

(1) Whether the trial court abused its discretion by admitting certain hearsay statements into evidence; and

(2) Whether Castaneda's sentence is inappropriate in light of the nature of the offense and his character.

## FACTS AND PROCEDURAL HISTORY

Castaneda and Tabitha Garza (Garza) were married on March 16, 2011. The couple lived at 5030 Reading Avenue, East Chicago, in Lake County, Indiana, with their two children, A.C. (a daughter) and C.C. (a son), as well as Garza's son from a previous relationship. Following the birth of C.C. on July 2, 2012, Garza took a four-week maternity leave before returning to her job as a medical assistant sometime in August of 2012. At the time, Castaneda was unemployed, so he cared for the children while Garza was at work. Although thirteen-month-old A.C. and one-month-old C.C. were home with Castaneda

all day, Garza's eight-year-old son attended school in the mornings until 12:30 p.m.

[5] At the end of September 2012, C.C. began experiencing "some incidences of vomiting, excessive spit-up, a period of time with diarrhea and fever." (Tr. p. 68). As a result, C.C.'s doctor recommended switching to a lactose-free formula and to place him in an upright position after feedings. After following the doctor's advice, C.C. began to show improvement. However, according to Garza, C.C. was still occasionally experiencing symptoms of reflux and had been in a fussy mood, so she intended to take him back to his doctor.

[6] On the morning of October 10, 2012, Garza awoke to take care of A.C. and ready her son for school and herself for work. Before leaving the house, Garza gave A.C. a bottle and placed her in the playpen to take a nap. At the time, Castaneda was still asleep, and three-month-old C.C. was asleep in the bed with him. Between 9:30 and 9:45 a.m., Garza woke Castaneda and instructed him to listen in case A.C. woke up. Garza then left for work. At approximately 1:30 p.m., Castaneda called Garza and sounded "panicked." (Tr. p. 87). He told Garza that she needed to come home because C.C. was not breathing. During this conversation, Garza could hear A.C. crying in the background. Garza instructed Castaneda to call 9-1-1, and she left work immediately.

[7] Within four minutes of Castaneda and Garza both calling 9-1-1, Jeremy Furto (Furto), a firefighter and first responder for the City of East Chicago, arrived at the residence. Castaneda was waiting at the door with C.C. in his arms, and he

told Furto that C.C. "was choking." (Tr. p. 35). Furto took the unconscious C.C. from Castaneda and observed that C.C. did not have a pulse, was not breathing, and was "[c]ool" to the touch. (Tr. p. 35). After checking to make sure that C.C.'s airway was not obstructed, Furto commenced infant CPR. Less than two minutes later, the ambulance arrived, and Furto transferred care of C.C. to the paramedic, Patrick Nickos (Nickos). Once C.C. was loaded into the ambulance, Nickos confirmed that C.C. did not have a pulse and was not breathing, and "[h]e was bluish in color." (Tr. p. 49). Using a laryngoscope to inspect the upper portion of C.C.'s airway, Nickos verified that there were no obstructions, such as vomit, blocking the trachea. Nickos resumed CPR, with Furto providing artificial ventilations via an Ambu bag. Although C.C.'s pulse returned with the administration of CPR, he "never took a breath on his own," and he was not getting sufficient oxygen to his blood. (Tr. p. 58). Thus, Nickos intubated C.C. with an endotracheal (ET) tube to provide oxygen directly to his lungs.

[8]     At 1:54 p.m., the ambulance arrived at St. Catherine's Hospital in East Chicago, where the emergency room care providers were waiting to immediately take over C.C.'s treatment. C.C., who remained unresponsive, received a lumbar puncture in order to ascertain whether he had any infections, as well as a CT scan of his head. The lumbar puncture did not provide any indication of infection, and the CT scan depicted swelling in C.C.'s brain. In addition, an x-ray established that C.C.'s ET tube was about one centimeter too low in the airway, so it was repositioned.

[9]     Because of his critical condition, C.C. was airlifted to Memorial Hospital in South Bend, Indiana, that same day. After C.C. departed from St. Catherine's in the helicopter, Castaneda and Garza drove together to the hospital in South Bend. On the way, Castaneda explained to Garza "[t]hat he grabbed [C.C.], that he tried breathing in his mouth, that he stuck his finger down his throat and that he shook him a little to tell him to breathe and that he wouldn't breathe." (Tr. p. 78).

[10]    En route to Memorial Hospital, the Med Flight team noted that C.C.'s "fontanel was full, was bulging and tense," indicating "that the brain was already swelling and under pressure." (Tr. p. 420). Upon arrival, C.C. was admitted to the pediatric intensive care unit. It was immediately "clear that [C.C.] had brain swelling that was cerebral edema." (Tr. p. 421). Additional CT scans were taken, which revealed intracranial bleeding—specifically subdural and subarachnoid hemorrhages. At this point, C.C.'s hospital care providers began to suspect that C.C. had been subjected to "non-accidental trauma" based on the fact that the history provided—*i.e.*, that he had stopped breathing due to choking—was inconsistent with the nature of his injuries, in conjunction with the fact that C.C.'s injuries were classic indicators of abusive head trauma.[1]

---

[1] According to C.C.'s pediatric critical care physician, Dr. Olubunmi Okanlami (Dr. Okanlami), the nomenclature has changed for the "constellation of injuries" that has historically been referred to as "Shaken Baby Syndrome." (Tr. p. 434). Practitioners now refer to this condition as "abusive head trauma" in order

[11] After C.C.'s admission to the hospital, a report was made to the Indiana Department of Child Services (DCS) in reference to C.C.'s "choking incident." (Tr. p. 123). On October 11, 2012, Tina Kozlowski (Kozlowski), a family case manager with the Lake County Office of DCS, was assigned to investigate based on the fact that there was "a near fatality" involving a child. (Tr. p. 125). When Kozlowski arrived at Memorial Hospital, she learned from C.C.'s care providers that the cause of his injuries "was most likely non-accidental trauma" although "[t]hey were still ruling out other medical issues." (Tr. pp. 141-42). Thereafter, Kozlowski conducted separate interviews with Garza and Castaneda.

[12] During his interview with Kozlowski, Castaneda described his version of events leading up to C.C.'s incapacitation. He stated that he had woken up at about 9:00 a.m., at which time he fed C.C., gave A.C. a bottle and placed her in her playpen, and then he and C.C. both went back to sleep. At approximately 1:00 p.m., he woke up because "he heard choking sounds coming from C.C." and "gasping," and then he "saw some substance coming out of [C.C.'s] mouth and nose." (Tr. pp. 126-27). Castaneda stated that he opened C.C.'s mouth to remove any substances, and "he tried blowing into the mouth to give breaths to [C.C.]" (Tr. p. 126). Castaneda also reported "that he shook [C.C.] lightly to see if he could arouse his son." (Tr. p. 126). Castaneda stated that he

to encompass additional mechanisms of injury, such as where a child has been shaken with or without impact or where a child has head trauma as a result of being pushed or hit. (Tr. p. 408).

attempted to revive C.C. for about ten to fifteen minutes before calling 9-1-1. Castaneda further explained to Kozlowski that C.C. had been ill recently and was having issues with vomiting. Kozlowski "asked him if that was frustrating. [Castaneda] said yes but then he said no very quickly, that he loved his son, he would never hurt his son." (Tr. p. 132). When Kozlowski inquired about whether Garza's oldest son was home during the choking incident, Castaneda recalled that he met Garza's son at the bus stop at 12:30 p.m. and then went back to sleep for half an hour, at which time he heard C.C. choking. Kozlowski also asked who was supervising fifteen-month-old A.C. during the four-hour span that he was supposedly napping with C.C., to which Castaneda did not offer a response. Later that evening, Castaneda called Kozlowski and stated "that he may have shook [C.C.] harder than he originally told [her]." (Tr. p. 133).

[13] On October 12, 2012, Dr. Eric Yoon (Dr. Yoon), an ophthalmologist, examined C.C. Using "an indirect op[h]thalmoscope," Dr. Yoon assessed C.C.'s retinas—that is, "the back part of the eye." (Tr. p. 377). Dr. Yoon concluded that C.C. "had diffuse retinal hemorrhages in all three layers of the retina, for both eyes." (Tr. p. 384). For the next several days, C.C., who had never regained consciousness, remained in critical condition and was maintained by mechanical ventilation. Subsequent scans of his brain showed damage that was "progressively worsen[ing]." (Tr. p. 412). C.C.'s doctor struggled to control his blood pressure, and EEG studies indicated ongoing seizure activity despite the administration of anti-seizure medication. There

were also signs of anoxic brain damage. Following an MRI scan on October 16, 2012, "it was clear that . . . there was pretty diffuse brain damage to the cerebral cortex, cerebellum as well as the spinal cord in the cervical region and that—all of those were not compatible with life." (Tr. p. 412). On the morning of October 17, 2012, after consulting with C.C.'s medical team, Garza made the decision to remove C.C. from the ventilator. Within five minutes of withdrawing life support, C.C. passed away.

[14] A few hours after C.C.'s death, Dr. Joseph Prahlow (Dr. Prahlow), a forensic pathologist, performed an autopsy on C.C. Dr. Prahlow determined that C.C. "died as a result of closed head and neck injuries" and ruled his death "a homicide." (Tr. pp. 270-71). In support of this determination, Dr. Prahlow made numerous findings indicating that C.C. was subjected to significant trauma. In relevant part, Dr. Prahlow found diastatic fractures, which are the result of extensive swelling of the brain, which causes the skull plates to separate at the suture lines. Dr. Prahlow examined C.C.'s brain and found a subscapular contusion on the left parietal region of the scalp, which led him to conclude that there was impact to C.C.'s head. Dr. Prahlow also found subdural hemorrhage, subarachnoid hemorrhage, retinal hemorrhages, and perioptic nerve hemorrhage, all of which he concluded to be the result of trauma. Microscopic examination revealed brain lacerations—*i.e.*, traumatic "disruption of the brain" tissue—and attempts at healing. (Tr. p. 249). There was also a contusion to the cervical spinal cord, which is located "very high in the neck, . . . right where the spinal cord attaches to the brainstem." (Tr. pp.

252-53). Particularly in infants, such injuries to the spinal cord result from "hyperflexion or hyperextension of the neck." (Tr. p. 253). Microscopically, within the cerebellum, medulla, and spinal cord, Dr. Prahlow detected globular staining with beta amyloid precursor protein, which proved to him that these areas of hemorrhaging were the result of actual "traumatic disruption of the . . . nervous tissue" as opposed to being the secondary result of a lack of blood flow leading to necrosis. (Tr. p. 267). When Dr. Prahlow examined C.C.'s thoracic cavity, he observed areas of bleeding in the posterior rib cage, which prompted his further examination. Although no fractures were visible in the x-rays and CT scans, microscopic testing confirmed healing fractures in several of C.C.'s posterior ribs, which would be consistent with a significant pressure/squeezing injury. Finally, although Dr. Prahlow detected that C.C. had interstitial pneumonia indicative of a respiratory illness, he found no evidence of aspirated material in the lungs to support a choking hypothesis.

[15] On March 8, 2013, the State filed an amended Information, charging Castaneda with Count I, neglect of a dependent by placing the dependent in a situation that endangers the dependent's life or health, resulting in death, a Class A felony, I.C. § 35-46-1-4(a)(1),(b)(3) (2012); Count II, murder, a felony, I.C. § 35-42-1-1(1) (2012); Count III, battery resulting in death, a Class A felony, I.C. § 35-42-2-1(a)(5) (2012); and Count IV, neglect of a dependent by depriving the dependent of necessary medical support, resulting in death, a Class A felony, I.C. § 35-46-1-4(a)(3),(b)(3) (2012).

[16] On October 19-23, 2015, the trial court conducted a jury trial. During its case-in-chief, the State relied primarily on the expert testimony of Dr. Prahlow, Dr. Yoon, and Dr. Okanlami. Dr. Prahlow, the pathologist who performed C.C.'s autopsy, testified that C.C. "died as a result of closed head and neck injuries," which "could include a component of shaking but definitely also includes a component of impact." (Tr. pp. 270-71, 274). Dr. Yoon, the ophthalmologist, testified that the severe hemorrhaging of all three retinal layers was "very suspicious of trauma." (Tr. p. 384). Specifically, he said that this type of damage usually results from "vigorously shaking the baby where his head is going back and forth," and, in fact, that C.C.'s retinal injuries were consistent with a violent shaking. (Tr. p. 385). Finally, C.C.'s pediatric critical care physician, Dr. Okanlami, testified that "this was definitely a child that was the subject of abusive head trauma, presumably by shaking" with the additional concern "that there was a delay in seeking medical care." (Tr. p. 439).

[17] The State also presented the testimony of Jermal Norris (Norris), who shared a cell with Castaneda at the Lake County Jail for a few months in 2013 while Castaneda awaited trial. Norris informed the jury that cellmates "tend to open up to each other." (Tr. p. 178). Thus, in exchange for lenient treatment in his own pending case, Norris testified as to the content of some of his conversations with Castaneda. In particular, Norris stated that Castaneda had claimed to be incarcerated because C.C. had been crying, and "he shook him." (Tr. p. 173). Norris further recounted that Castaneda had expressed doubts about the paternity of his younger child, believing instead that the father of Garza's older

son might actually be C.C.'s biological father.[2] In order to cope with the stress he was feeling about this situation, Castaneda admitted to Norris that he had been smoking marijuana, including on the day that he shook C.C.

[18] In contrast to the State's expert witnesses, during the defense's case, Dr. Edward Willey (Dr. Willey), a pathologist whose practice is centered on providing consultations for attorneys, testified that he found no inflicted traumatic injuries when he reviewed the medical records pertaining to C.C. Instead, he opined that C.C.'s death was natural and was the result of external hydrocephalus,[3] which he surmised had been overlooked during C.C.'s treatment and autopsy. Dr. Willey additionally testified that "Shaken Baby Syndrome is imaginary" and that he "[does not] believe you can damage [a] child by shaking it." (Tr. pp. 558, 561). Another defense witness, Dr. Amjad Alkadri (Dr. Alkadri), an interventional radiologist, reviewed C.C.'s x-rays and found no evidence of rib fractures. However, Dr. Alkadri also testified that "[t]his is a clear case of a baby that was shaken." (Tr. p. 364).

[19] At the close of the evidence, the jury returned a guilty verdict for Count I, neglect of a dependent resulting in death; Count II, reckless homicide as a Class C felony (as a lesser included offense of murder); Count III, battery resulting in

---

[2] During the trial, the State also elicited testimony from Garza that, before they were married, Castaneda had been jealous of her relationship with her older son's father but that those issues were resolved.

[3] According to Dr. Willey, external hydrocephalus is "a condition where there's [sic] collections of fluid around the brain." (Tr. p. 501). He explained that his diagnosis was based on C.C.'s head circumference, which had increased from the 50th percentile on a pediatric growth chart to the 95th percentile between his two-month well-check appointment and his admission to Memorial Hospital.

death; and Count IV, neglect of a dependent resulting in death. On December 2, 2015, the trial court held a sentencing hearing. The trial court merged Counts I and II into Count III and accordingly entered a judgment of conviction for Count III, battery resulting in death as a Class A felony. The trial court also entered a judgment of conviction for Count IV, neglect of a dependent resulting in death, which the trial court reduced to a Class D felony. The trial court sentenced Castaneda to serve consecutive terms of twenty-eight years on Count III and one and one-half years on Count IV, resulting in an aggregate sentence of twenty-nine and one-half years, fully executed in the Indiana Department of Correction.

[20] Castaneda now appeals. Additional facts will be provided as necessary.

## DISCUSSION AND DECISION

### I. *Admission of Evidence*

[21] Castaneda claims that the trial court abused its discretion by admitting hearsay into evidence. A trial court is vested with sound discretion to admit or exclude evidence at trial, and we afford the trial court's decision "great deference on appeal." *VanPatten v. State*, 986 N.E.2d 255, 260 (Ind. 2013). "We will not reverse such a decision, often made in the context of heated testimony and argument, unless it is clearly contrary to the logic and effect of the facts and circumstances of the case or misinterprets the law." *Id.*

[22] Although the context was only vaguely described at trial, it appears that shortly after C.C. died, Garza created an online petition, imploring the "Lake County

Prosecutor, East Chicago Police, [and] Indiana State Police" to charge Castaneda with C.C.'s death. (Tr. p. 592). During the trial, Garza provided testimony that was inconsistent with her statements in the online petition. Thus, the State inquired into a portion of the contents of the online petition in order to impeach Garza. First, the State questioned her as follows:

Q.    Now, you indicated that you started this on-line petition?
A.    Yes.
Q.    That you supplied the information; is that correct?
A.    Yes, ma'am.
Q.    And in this on-line petition, you said that the man [*i.e.*, Castaneda] was tired from staying up getting high the night before, he wanted a nap. [C.C.] had been sick and was fussy. Do you recall putting that information on your website, "Justice for [C.C.]"?
A.    That was the information that I was fed by somebody else.
Q.    Fed by whom?
A.    [Kozlowski].
* * * *
Q.    [Kozlowski] told you she saw your husband the night before?
A.    No. She when speaking with me at the hospital, when she interviewed me, kept implying that he was up getting high, that he was doing this, he was doing that, and I was angry at the time. My child was on life support, and I wanted somebody to blame for it.
Q.    So you're saying the DCS worker told you that [Castaneda] had been getting high the night before?
A.    Yes.

(Tr. pp. 84-85).[4]  Additionally, the State made the following inquiry:

> Q.    But do you recall in the website that you started called "Justice for [C.C.]" what you said was [Castaneda's] story was rehearsed and he practiced it on anyone who would listen.  Do you recall writing that on your website?
> A.    Yes.

(Tr. p. 103).  Then, on cross-examination, Castaneda clarified Garza's direct testimony as follows:

> Q.    . . . [The State] asked you about some words that you had put on your website, specifically the quotation, "[Castaneda's] story was rehearsed and he tells it to anyone[.]"  Are those your words, or are those [Kozlowski's] words?
> A.    Those were my words at the time.
> Q.    That his story was rehearsed?
> A.    I was angry and that's just how I felt at the time.
> Q.    Do you think his story was rehearsed?
> A.    No.

(Tr. pp. 105-06).

[23]    Thereafter, the State completed its examination of Garza and proceeded with the remainder of its witnesses.  However, prior to resting its case, the State sought to read into evidence a portion of Garza's online petition "as past [recollection] recorded because when [Garza] testified about . . . [t]he on-line

---

[4] We note that Garza specifically stated that Kozlowski interviewed her *before* Kozlowski spoke with Castaneda, and Kozlowski had not yet had the opportunity to conduct any investigation from which she could have learned such information about Castaneda.

petition information, she did not admit—she kind of said she may have said it, so I would like to as a past recollection recorded because she did admit that she made it." (Tr. p. 586). Over Castaneda's hearsay objection, the trial court permitted the State to read the following excerpt from Garza's petition into evidence: "The man was tired from staying up getting high the night before. He wanted a nap. [C.C.] had been sick about two weeks and was fussy. His story was rehearsed and he practiced it on anyone who would listen." (Tr. p. 592).

[24] On appeal, Castaneda claims that the trial court erroneously allowed the State to read the hearsay statements into evidence. A "hearsay" statement is one that "(1) is not made by the declarant while testifying at the trial or hearing; and (2) is offered in evidence to prove the truth of the matter asserted." Ind. Evidence Rule 801(c). Hearsay is not admissible unless a specifically delineated exception set forth in Indiana Evidence Rule 803 applies. Evid. R. 802.

[25] In this case, the State sought to admit the statements from the petition as a recorded recollection. Indiana Evidence Rule 803(5) provides an exception to the hearsay rule for recorded recollections. This Rule states that a record that: "(A) is on a matter the witness once knew about but now cannot recall well enough to testify fully and accurately; (B) was made or adopted by the witness when the matter was fresh in the witness's memory; and (C) accurately reflects the witness's knowledge" may be admitted and "read into evidence." Evid. R. 803(5).

[26] We find that the admission of the statement fails the first prong of the recorded recollection criteria. As our supreme court has explained, "[t]he recorded recollection exception applies when a witness has insufficient memory of the event recorded, but the witness must be able to 'vouch for the accuracy of the prior [statement].'" *Kubsch v. State*, 866 N.E.2d 726, 734 (Ind. 2007) (second alteration in original) (quoting *Gee v. State*, 389 N.E.2d 303, 309 (Ind. 1979)). Here, there is no indication that Garza had insufficient memory of the statements that were read into evidence. Rather, by the time of trial, it appears that she no longer blamed Castaneda for C.C.'s death and, therefore, had simply disavowed her prior statements. Particularly, Garza acknowledged at trial that she wrote the petition "in the days following my son passing away." (Tr. p. 83). Although she testified that she had gone to bed before Castaneda and did not personally observe his activities on the night prior to the incident, Garza recalled that she wrote in the petition that Castaneda had been up smoking marijuana that night and was unable to nap the next day because of C.C.'s fussiness. However, at trial, she claimed that she was fed this information by Kozlowski and that she no longer held these beliefs. Similarly, Garza specifically remembered that she was angry and, at the time, believed that Castaneda's story was rehearsed. By trial, Garza had changed her tune. Accordingly, because Garza had sufficient memory of the statements she made

in her online petition, they should not have been read into evidence pursuant to the recorded recollection exception of the hearsay prohibition.[5]

[27] Nevertheless, we find that any error in the admission of the statements is harmless. "'[E]rrors in the admission of evidence are to be disregarded as harmless error unless they affect the substantial rights of a party.'" *VanPatten*, 986 N.E.2d at 267 (alteration in original) (quoting *McClain v. State*, 675 N.E.2d 329, 331 (Ind. 1996)). In deciding whether the error in the admission of evidence affected the defendant's substantial rights, we "must assess the probable impact of the evidence upon the jury." *Id.* (quoting *McClain*, 675 N.E.2d at 331). An error in the admission of hearsay evidence does not provide a basis for reversal if "it is merely cumulative of other evidence admitted." *Id.* (quoting *McClain*, 675 N.E.2d at 331-32).

[28] Castaneda asserts that he was prejudiced by the admission of the hearsay. In particular, he argues that "[a]fter hearing the complicated and conflicting testimony of the experts, the last thing presented to the jury was the [State] reading the excerpt from the website which indicated that . . . Castaneda had been getting high and staying up late the night before the child's death,

---

[5] The State contends that the statements were admissible under Evidence Rule 803(3), which allows for the admission of "[a] statement of the declarant's then-existing state of mind (such as motive, design, intent, or plan) or emotional, sensory, or physical condition (such as mental feeling, pain or bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, . . . or terms of the declarant's will." However, we need not address this argument based on our harmless error analysis, which follows.

improperly impugning his character and encouraging the jury to convict based upon his character." (Appellant's Br. pp. 11-12). We disagree. During the State's examination and Castaneda's cross-examination of Garza, she acknowledged that she had drafted an online petition in which she discussed that Castaneda had been up the night before the incident smoking marijuana; that he wanted to take a nap; that C.C. was sick and fussy; and that he had rehearsed his version of events. Notwithstanding the fact that Garza claimed at trial that she had been fed some of the information by Kozlowski and that she no longer maintained those beliefs, the State's act of reading the statements into evidence was merely cumulative of Garza's prior testimony.

[29] Moreover, "[t]he improper admission of evidence is harmless error if we are satisfied that the conviction is supported by such substantial independent evidence of guilt that there is little likelihood the challenged evidence contributed to the conviction." *Corbally v. State*, 5 N.E.3d 463, 470 (Ind. Ct. App. 2014). Here, the evidence established that C.C. suffered a traumatic brain injury while in the care of Castaneda. Although Castaneda informed the first responder, Furto, that C.C. "was choking," there is no evidence that C.C.'s airway was obstructed. (Tr. p. 35). Rather, the medical evidence reveals that C.C. sustained subdural and subarachnoid hemorrhages; brain lacerations; retinal hemorrhages; perioptic nerve hemorrhage; diastatic fractures from extensive brain swelling; cervical spinal cord hemorrhage; a contusion on the parietal scalp signifying impact to the head; and he had rib fractures in the early stages of healing. It was also clear that C.C. suffered brain damage based on a

prolonged lack of oxygen to the brain. Although there was conflicting evidence on the cause of this anoxic event, Dr. Okanlami explained that it was likely the result of the fact that, after he sustained an injury that caused his brain to swell and bleed, C.C. stopped breathing, and Castaneda delayed in seeking medical attention that could have helped restore oxygenation to C.C.'s brain.

[30] In addition, Castaneda informed both Garza and Kozlowski that he "shook [C.C.] a little" to revive him, and he later confessed to Kozlowski "that he may have shook [C.C.] harder than he originally told [her]." (Tr. pp. 78, 133). According to Norris, Castaneda admitted that C.C. had been crying, and "he shook him." (Tr. p. 173). Finally, Dr. Prahlow, Dr. Yoon, Dr. Okanlami, and Dr. Alkadri all testified that C.C.'s fatal injuries were consistent with having been violently shaken. Accordingly, based on the substantial evidence of his guilt, we find that the admission of the hearsay "was unimportant in relation to everything else the jury considered on the issue in question." *Corbally*, 5 N.E.3d at 470.[6]

---

[6] Castaneda also argues that the admission of the statements violated his "rights under the Sixth Amendment of the United States Constitution to confrontation of the witness against him" because Garza "was clearly not available at the time the statement was admitted." (Appellant's Br. p. 12). We, however, find that Castaneda has waived this argument for appeal because he did not object on this ground at trial. Rather, he objected solely on the basis of hearsay, and it is well established that "[a] defendant may not object on one ground at trial and raise another on appeal." *Saunders v. State*, 848 N.E.2d 1117, 1122 (Ind. Ct. App. 2006), *trans. denied*.

## II. *Sentencing*

[31] Castaneda also claims that his sentence is inappropriate. It is well established that matters of sentencing are reserved to the trial court's discretion and should receive considerable deference on appeal. *Cardwell v. State*, 895 N.E.2d 1219, 1222 (Ind. 2008). It is an abuse of the trial court's sentencing discretion if its "decision is clearly against the logic and effect of the facts and circumstances before the court, or the reasonable, probable, and actual deductions to be drawn therefrom." *Gross v. State*, 22 N.E.3d 863, 869 (Ind. Ct. App. 2014) (internal quotation marks omitted), *trans. denied*. Even where a trial court has imposed a valid sentence, our court has the authority to revise the sentence if, "after due consideration of the trial court's decision, [we] find[] that the sentence is inappropriate in light of the nature of the offense and the character of the offender." Ind. Appellate Rule 7(B).

[32] A Class A felony is punishable by "a fixed term of between twenty (20) and fifty (50) years, with the advisory sentence being thirty (30) years." I.C. § 35-50-2-4 (2012). A Class D felony is subject to a term of imprisonment "of between six (6) months and three (3) years, with the advisory sentence being one and one-half (1 ½) years." I.C. § 35-50-2-7(a) (2012). In this case, the trial court identified several aggravating circumstances, including the tender age of the child, the violation of a position of trust (only applied as to the Class A felony battery charge), and Castaneda's deceptive behavior "in trying to cover [his] tracks." (Tr. p. 705). As for mitigating circumstances, the trial court noted Castaneda's lack of a significant criminal history, his positive relationship with

his family and community members, and the fact that incarceration would be a hardship on his family. Accordingly, for Castaneda's conviction of battery resulting in death as a Class A felony, the trial court imposed a mitigated sentence of twenty-eight years. As for his conviction of Class D felony neglect of a dependent, the trial court imposed the advisory sentence of one and one-half years. Although the trial court did not enhance Castaneda's individual sentences, it relied on the presence of aggravating circumstances to order that Castaneda's sentences run consecutively, resulting in an aggregate term of twenty-nine and one-half years.

[33] "Castaneda concedes that the offenses for which he was convicted; causing the death of his infant son and failing to request medical help in a timely fashion, are extremely serious. His request for a review pursuant to Rule 7(B) . . . is based upon the inconsistent decisions of the trial court when evaluating aggravating and mitigating circumstances for each offense." (Appellant's Br. p. 13). Specifically, Castaneda argues that "it is inappropriate for a trial court to identify and weigh aggravating and mitigating circumstances and impose a sentence less than the advisory for one offense; weigh the same mitigating and two fewer aggravating circumstance[s] and impose a sentence for the advisory term for a related offense; and then to use an unidentified aggravating factor to impose consecutive sentences." (Appellant's Br. p. 15).

[34] We find that Castaneda's argument is more appropriately framed as whether the trial court abused its sentencing discretion rather than whether his sentence

is inappropriate. A trial court may be found to have abused its sentencing discretion

> if it: (1) fails to enter a sentencing statement at all; (2) enters a sentencing statement that explains reasons for imposing a sentence—including a finding of aggravating and mitigating factors if any—but the record does not support the reasons; (3) enters a sentencing statement that omits reasons that are clearly supported by the record and advanced for consideration; or (4) considers reasons that are improper as a matter of law.

*Gross*, 22 N.E.3d at 869 (quoting *Anglemyer v. State*, 868 N.E.2d 482, 490-91, *clarified on reh'g*, 875 N.E.2d 218 (Ind. 2007)) (internal quotation marks omitted). If we find an abuse of discretion, we will only remand for resentencing "'if we cannot say with confidence that the trial court would have imposed the same sentence had it properly considered reasons that enjoy support in the record.'" *Id.* (quoting *Anglemyer*, 868 N.E.2d at 491).

[35] We first note that Castaneda has not cited any authority to support his assertion that the trial court is constrained from imposing consecutive sentences simply because it exercised its discretion to impose advisory/mitigated sentences. Rather, our court has previously found

> that there is "no basis for holding that a trial court is restricted to a one-step balancing process when sentencing a defendant for multiple crimes" and that "it is permissible for a trial court to consider aggravators and mitigators in determining the sentence for each underlying offense and then to independently consider aggravators and mitigators in determining whether to impose concurrent or consecutive sentences."

*Id.* at 870 (quoting *Frentz v. State*, 875 N.E.2d 453, 472 (Ind. Ct. App. 2007), *trans. denied*). Moreover, we have long held that "[t]he decision to impose consecutive sentences lies within the discretion of the trial court," and "[a] single aggravating circumstance may be sufficient to support the imposition of consecutive sentences." *Id.* at 869.

[36] Here, the trial court identified multiple aggravating circumstances: C.C.'s age; Castaneda's violation of a position of trust; and Castaneda's deceptive behavior. After identifying all of the aggravating and mitigating factors and imposing advisory/mitigated sentences, the trial court stated, "And given these aggravating factors that I've listed, I think consecutive sentence is in fact appropriate." (Tr. p. 707). Therefore, we find no abuse of discretion in the trial court's decision to impose consecutive sentences despite the fact that the underlying sentences were advisory/mitigated.

[37] In addition, although Castaneda has not fully developed his argument pursuant to Appellate Rule 7(B), we find that his sentence is not inappropriate. The purpose of appellate review of sentences "should be to attempt to leaven the outliers, and identify some guiding principles for trial courts and those charged with improvement of the sentencing statutes, but not to achieve a perceived 'correct' result in each case." *Cardwell*, 895 N.E.2d at 1225. Ultimately, "whether we regard a sentence as appropriate at the end of the day turns on our sense of the culpability of the defendant, the severity of the crime, the damage done to others, and myriad other factors that come to light in a given case." *Id.*

at 1224. On review, we focus on "the length of the aggregate sentence and how it is to be served." *Id.*

[38] Although Castaneda concedes that the nature of his offense is "extremely serious," we find this description to be woefully inadequate. (Appellant's Br. p. 13). As the caregiver at the time, Castaneda's responsibility was to ensure the health and well-being of his son. C.C. was only three months old; he depended on Castaneda to meet all of his needs. Instead, the evidence indicates that Castaneda could not tolerate having his sleep disturbed by a sick, crying infant. After inflicting injuries on C.C. which caused C.C. to undergo cardiopulmonary arrest, Castaneda delayed in seeking medical attention and caused further oxygen deprivation to C.C.'s brain. Castaneda fabricated a story about C.C. choking, as evidenced by the fact that C.C.'s airway was not obstructed, in order to protect his own interests at the risk of obtaining proper treatment for his child. At the time of his autopsy, C.C. was found to have sustained, in part, hemorrhaging to his brain, retinas, and spinal cord, which were consistent with shaking and impact to the head.

[39] As to Castaneda's character, the trial court found that, "[o]utside of this instance, you're a good guy." (Tr. p. 701). Castaneda has a minimal criminal history, consisting of a 2009 misdemeanor conviction for trespassing. However, he has previously been arrested for possession of marijuana (which was ultimately dismissed), and there was evidence presented during the trial that Castaneda was smoking marijuana at the time he hurt C.C. Based on the

facts before us, we cannot say that Castaneda's twenty-nine-and-one-half-year sentence is inappropriate.

## CONCLUSION

[40] Based on the foregoing, we conclude that the trial court's admission of hearsay statements amounted to harmless error. We further conclude that Castaneda's sentence is not inappropriate.

[41] Affirmed.

[42] Bailey, J. and Barnes, J. concur